**Maryann BANKS et al., Plaintiffs,**

v.

**Ralph J. PERK, as Mayor of the City of Cleveland, et al., Defendants.**

**Civ. A. No. 72–115.**

United States District Court,
N. D. Ohio, E. D.

May 2, 1972.

---

16. Morse v. Lewis, 54 F.2d 1027, 1029 (4 Cir. 1932) ; see also Ellis v. Carter, 178 F.2d 791 (4 Cir. 1949), Chicago Mercantile Exchange v. Tieken, 178 F. Supp. 779 (N.D.Ill.1959).

C. Lyonel Jones, Edward R. Stege, Jr., Lloyd Snyder, Cleveland, Ohio, American Civil Liberties Union of Greater Cleveland, Eugene Sidney Bayer, Cleveland, Ohio, Nat'l Assoc. for the Advancement of Colored People, Russell Adrine, Cleveland, Ohio, for plaintiffs.

Richard Hollington, Malcolm Douglas, Law Director, Nicholas DeVito, Asst. Law Dir., Frederick J. Livingstone, Kelley & McCann, Walter Kelley, Jr., Cleveland, Ohio, for defendants.

## MEMORANDUM OPINION AND ORDER

BATTISTI, Chief Judge.

## A. INTRODUCTION

This suit is instituted pursuant to 42 U.S.C. §§ 1981 and 1983 and invokes the jurisdiction of this Court pursuant to 28 U.S.C. § 1343(3) and (4). It is brought in behalf of all Negroes and Non-White tenants in and applicants for public housing in the City of Cleveland. The defendants, Perk, Petro and Rush (here-inafter referred to as the City or its agents) are sued in their official capacities as Mayor, Executive Secretary to the Mayor, and Building Commissioner of the City of Cleveland, respectively. The defendant Cuyahoga Metropolitan Housing Authority (CMHA) is a public corporation created under Section 3735.-27 et seq. of the Ohio Revised Code, and is authorized to engage in the development and administration of low-rent public housing in the City of Cleveland. Defendant Fitzgerald is sued in his official capacity as Executive Director of CMHA.

The plaintiffs are seeking a declaration that the action of defendant City and its agents in revoking or permitting the revocation of building permits for construction of public housing at the Green Valley and Crest Drive sites violates the due process and equal protection clauses of the Fourteenth Amendment of the United States Constitution; an injunction restraining these defendants from further perpetuating what they allege to be the racially discriminatory public housing system by any interference with the expeditious completion of any and all public regular family housing units which are already planned for construction in predominately White neighborhoods; to restrain these defendants from imposing any burdens on the planning and construction of public housing which are more onerous than those placed upon the planning and construction of any private housing, building or structure; and to restrain defendants Perk, Petro, and Rush from failing to immediately issue all necessary building permits to enable the prompt commencement of construction of the planned public housing units at Green Valley and Crest Drive. CMHA has joined in Count I as a cross-claimant against the City defendants.

Count II is directed against CMHA. The plaintiffs pray that CMHA's practice of racially discriminatory site selection for regular family public housing be declared to be violative of the Fourteenth Amendment and that a preliminary in-

junction issue restraining the planning, letting of bids, or construction of any public housing units in the Negro neighborhoods on the east side of the City of Cleveland. They also pray for a permanent injunction which would enjoin construction of public housing in the Negro neighborhoods on the east side of the City unless and until such time as there is a balance achieved of regularly equal number of regular family public housing units in all areas and wards of the City.

The City of Cleveland is a racially divided city. Except for a small pocket of Negroes on the west side of the Cuyahoga River, in the Bellaire Section, almost all (96%) of the Negro citizens of the City live on the east side of the River. The Negro population of the City of Cleveland has grown dramatically since 1930 when Negroes constituted only 8% of the total population of the City. Today it is more than 38%. Since 1950 three neighborhoods on the east side of Cleveland, Hough, Glenville and Lee-Seville, have changed from primarily White to almost entirely Negro. As a result, the schools in the City of Cleveland are quite badly segregated. Of the 183 public schools in the City, 85 are 90% to 100% Negro, and 72 are under 10% Negro. Approximately 95% of the Negro children attending public schools in the City attend schools which are all or substantially all Negro. In addition, in the last six years more than 5,000 jobs have moved from Cleveland's inner city to the outskirts of the City and to nearby suburbs. Access to these jobs has decreased for those who live in the inner city. Since this city is faced with such a massive segregation problem, a dispersal of urban housing patterns seems to be the most reasonable alternative to a massive busing program in order to eliminate the resulting segregation in the public schools. See Crow et al. v. Brown et al., 332 F.Supp. 382 (N.D.Ga. 1971) aff'd 457 F.2d 788 (5th Cir. 1972).

B.  COUNT I

It is well known that the issue of public housing, like the issue of school busing, is being hotly debated. Many oppose public housing with the best of motives, while some, unfortunately, oppose it on racial grounds. If our constitutional system is to survive, we must move with the greatest of speed to end any and all discrimination based upon race in every area of human endeavor, including, obviously, schools, housing and jobs.

It has been more than one hundred years since the adoption of the Thirteenth, Fourteenth, and Fifteenth Amendments and almost twenty years since the landmark case of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) was decided by a unanimous Supreme Court. Yet, unless realistic action is taken within the immediate future, we may expect the east side of Cleveland to become almost totally Black, while the west side will remain largely White.

On November 8, 1971, a new city administration took office. Prior to this date, it was announced that this administration would oppose public housing in areas where the majority of the residents were opposed to the projects. However, a proposal was made for a "new town-in-town" project for the Negro neighborhoods on the east side of Cleveland. On November 10, 1971, defendant City and its agents ordered the Green Valley permits revoked. The Green Valley site, along with the Crest Drive site, are in Ward 9 on the west side. Green Valley was to consist of 132 units, while Crest Drive was to consist of 18 units. Both of these developments are to be constructed pursuant to the 1949 Co-operation Agreement between CMHA and the City.

The stated basis for the revocation of the Green Valley permits was that the person who applied for the permits was not the owner of the property and did not have a valid option to purchase the property. The defendant City did not seek the opinion of its Law Department on the propriety of the building permits or their revocation. However, prior to the granting of the building permits, the Law Department was asked to determine whether these permits could be

granted. The Law Department found that the permits could be granted upon the submission of an affidavit by the applicants, Building System, Inc. (BSI). This was done and the permits were issued.

On November 9, 1971, representatives of Rzepka Construction Company, to whom building permits had been granted for the Crest Drive site, sent a letter to the Chief Building Inspector requesting an extension of previously granted building permits for the Crest Drive site. That letter read in part:

"We request that the enclosed permits be extended for a period of ninety (90) days because of the inclement weather conditions. Ground was broken on November 8, 1971, and construction will continue as soon as possible."

The permits were extended upon receipt of this letter.

On December 22, 1971, defendant City ordered suspension of the Crest Drive permits. It found that Rzepka Construction Company had misrepresented in its November 9 request for an extension that construction had commenced, which allegedly constituted a violation of Section 5.0707 of the Codified Ordinance of the City of Cleveland.

The record is clear that there was neither a misrepresentation nor had construction begun. Subsequent to the granting of the extension there were discussions between a consultant for Rzepka and members of the defendant City's Building Division to discuss foundation design for the Crest Drive sites. In addition, if construction had begun on the site, there would be no need for an extension of the building permit. It should be noted that no provision in the Ordinance of the City exists for the suspension of building permits. On January 20, 1972, this was rectified by the revocation of the Crest Drive permits.

■ The actions of defendant City and its agents are regrettable. Such actions, while perhaps rationalizable on other grounds, clearly have a racially discriminatory effect. The revocation of the building permits for the Green Valley and Crest Drive sites constitutes a violation of 42 U.S.C. §§ 1981, 1983, 2000d and 3601 et seq. in that it denies the Negro plaintiffs equal protection of the laws, subjects them to discrimination on grounds of race or color in the federally assisted public housing program and deprives them of the right to equal access to housing on a non-discriminatory basis. Kennedy Park Homes et al. v. Lackawanna, 436 F.2d 108 (2d Cir. 1971), cert. den., 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971); Dailey v. City of Lawton, 425 F.2d 1037 (10th Cir. 1970); Crow v. Brown et al., 332 F.Supp. 382 (N.D.Ga.1971), aff'd. 457 F.2d 788 (5th Cir. 1972). See generally, Hawkins et al. v. Town of Shaw, Mississippi et al., 461 F.2d 1171 (5th Cir. 1972 (*en banc*)).

There was no factual basis on which to revoke the permits here in question. The revocations were arbitrary, capricious and not in the furtherance of any compelling governmental interest.

■ The aforementioned public pronouncements to oppose public housing in any areas where the residents are opposed to it and the City's continued affirmations of that proposition are contrary to the national housing policy. It is the duty of city administrations in the United States to support and aid progressive proposals which have as their goal the elimination of racial concentrations in their cities. No matter how a housing authority may try, their aims and goals cannot be met without the support and leadership of the administration within the city it attempts to build public housing. Since this nation is committed to a policy of balanced and dispersed public housing, low-income Blacks can no more be confined to a concentrated area than that they can be required to send their children to segregated schools. Crow v. Brown, supra, 332 F.Supp. at 390. Moreover, deprivation of equal housing rights caused to some extent by the neglect or thoughtlessness of local official constitutes an equal protection violation. Kennedy

**1180**

Park Homes et al. v. City of Lackawanna, *supra*. See Hobson v. Hansen, 269 F.Supp. 401 (D.D.C.1967), aff'd. *sub nom.*, Smuck v. Hobson, 132 U.S.App. D.C. 372, 408 F.2d 175 (1969) (*en banc*). These courts have unequivocally stated that local officials may not exercise the normal modicum of discretion if the clear result of such discretion is the segregation of low-income Blacks from all White neighborhoods.

In *Lackawanna*, Mr. Justice Clark, sitting on the Second Circuit, found that a variety of plausible explanations (e. g., not enough sewers, need for a park) did not overcome the fact that Lackawanna had highly segregated residential patterns and the denial of the zoning change in question clearly perpetuated this discrimination in that it denied the Negro plaintiffs the *right* to reside in this exclusively White area. He continued:

> "The plaintiffs sought to exercise their constitutional right of 'freedom from discrimination by the States in the enjoyment of property rights.' Shelley v. Kraemer, 334 U.S. 1, 20, 68 S.Ct. 836, 845, 92 L.Ed. 1161 (1948). The effect of Lackawanna's action was inescapably adverse to the enjoyment of this right. In such circumstances the City must show a compelling governmental interest in order to overcome a finding of unconstitutionality. Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). The City has failed to demonstrate an interest so compelling." 436 F.2d at 114.

In Dailey v. City of Lawton, supra, the Tenth Circuit, affirming the sound decision of the District Court, 296 F.Supp. 266 (D.Okl.1969), said:

> "The racial prejudice alleged and established by the plaintiffs must be met by something more than bald, conclusory assertions that the action was taken for other than discriminatory reasons. See Norris v. Alabama, 294 U.S. 587, 598, 55 S.Ct. 579, 79 L.Ed. 1074, and Chambers v. Hendersonville

City Board of Education, 4 Cir., 364 F.2d 189, 192." 425 F.2d at 1039–1040.

■ Judge Bohanon in his well-reasoned opinion stated that "most persons will not admit publicly that they entertain any bias or prejudice against members of the Negro Race or other minority races . . . ." 296 F.Supp. at 268. The Tenth Circuit Court of Appeals in affirming Judge Bohanon's opinion noted that . . . "[I]f proof of a civil right violation depends on an open statement by an official of intent to discriminate, the Fourteenth Amendment offers little solace to those seeking its protection." 425 F.2d at 1039. Therefore, in the absence of any supervening necessity or compelling governmental interest, any municipal action or inaction, overt, subtle or concealed, which perpetuates or reasonably could perpetuate discrimination especially in public housing, cannot be tolerated.

Since this is a motion for a preliminary injunction, it must be determined whether the plaintiffs have proved that there is a reasonable probability of success on the merits, a showing of irreparable injury, and a balance of the equities. Cragett v. Board of Education, 234 F. Supp. 381, 384 (N.D.Ohio, E.D.1964). The evidence on Count I is sufficient for granting the desired injunction.

Accordingly, it is hereby ordered that defendant City and its agents are restrained from failing to issue forthwith all necessary building permits to enable the prompt commencement of construction of the planned public housing units at the Green Valley and Crest Drive sites.

The City defendants urge that they have never imposed higher standards for public housing as opposed to non-public housing sites or building permits. Therefore, they should be ready and willing to take such steps as are necessary to insure that they and their agents do not in any way hinder the efforts of the CMHA to build public housing on the west side and to place Blacks therein.

## C. COUNT II

This count of plaintiffs' complaint is far more complex than Count I. Count II alleges that historically CMHA has constructed two kinds of housing projects —one for Whites and one for Blacks. Projects are built in each area, and it is alleged that CMHA has assigned White tenants to projects in White areas and Black tenants to projects in Black neighborhoods. As of the end of 1949, Cleveland had seven public housing estates. The racial composition of these estates mirrored the racial composition of the census tracts in which the estates were located. The almost totally Black Outhwaite and Carver Park estates were in Black census tracts, while the population of the Valley View, Woodhill, Lakeview and Riverview estates reflected the absence of Blacks from the census tracts in which they are located.

At the end of 1964, Cleveland had eleven housing estates. Except for the Woodhill and Springbrook-Wade Park Estates, the others clearly mirrored the racial composition of the census tracts in which they are located. This segregation is not entirely the fault of CMHA. Both Outhwaite and Carver Park were built by the Federal Government under the Public Works Administration and CMHA has no control in the location of Carver Park. Garden Valley was constructed as relocation housing so that the Vincent-Charity urban renewal project could proceed. The King-Kennedy project on the east side was constructed under the Federal Slum Clearance Project. Four of the projects under the control of CMHA are exclusively elderly units; however this suit concentrates on discrimination in the Family Housing Program.

Prior to the Civil Rights Commission hearing held in Cleveland between April 1 and 7, 1966, CMHA's attempts to integrate were less obvious than they are today. Many of CMHA's activities seem to have the effect of continuing rather than curtailing the racial segregation then present in Cleveland. But, CMHA is not totally or perhaps even largely to blame for the fact that Cleveland is second only to Milwaukee, Wisconsin in residential segregation. However, this Court is more interested in attempting to integrate housing patterns in Cleveland than it is in placing blame for past segregation. It is clear that the task facing CMHA is Herculean in dimension.

At this time, about 86% of the applicants for regular family housing rental units are Negro, and 90% of the families on the waiting list for home ownership units are Negro. Approximately 62% of all public housing units operated by CMHA, including elderly units, are located in predominately Negro census tracts.

In late 1970 CMHA determined that Cleveland needed at least 6,750 low-income public housing units. CMHA's planner prepared an eight-sector map which showed how these units should be placed proportionately about the City. The request for 6,750 units was reduced to 2,500 units by the Cleveland City Council. Subsequently, the defendant City and CMHA entered into a new Cooperation Agreement for the building of 2,500 units to be scattered about the City.

The first phase of construction under the 1971 Cooperation Agreement called for the turnkey development of 500 single family scattered-site home ownership units to be dispersed throughout the City. The only limitations placed on site selection were a limit of 25 units to be built on each site, a limit of 30 bedrooms to be built on each acre of land, and a limit on the number of units to be built in each of the eight sectors into which the City had been subdivided. Only the last of these limitations will be analyzed.

CMHA admits that a substantial number of the proposed sites are in the Black east side sections of the City, and that less than ⅖ of the sites are on the west side. It is also noteworthy that CMHA, in developing site selection criteria, has not considered racial criteria nor has it developed a policy of limiting the number

of sites to be selected in Negro neighborhoods.

The plaintiffs have admitted evidence that certain west side locations have been rejected, while certain east side locations have been approved. This Court is not in the business of building public housing. It is authorized only to determine whether the policies and, in general terms, the practices of CMHA are in conflict with the Fourteenth Amendment to the Constitution of the United States. It is less concerned about exactly where public housing is to be built, in terms of what plot or street, than it is with whether the building of *any* homes on the east side is permissible under the Fourteenth Amendment, and if so, how many, either in absolute number or percentage.

Under CMHA policy, the manager of each estate is responsible for filling vacancies. Under the freedom of choice plan, CMHA has recently instituted applications for public housing which are sent to estates on a random basis as vacancies occur, and the estate managers contact the applicant to determine whether they desire to move into the vacant estate. In this light it is significant that the racial composition of the estate managers reflects the racial composition of the estates managed.

■ While CMHA's policies and practices have been in good faith, they have contributed to residential segregation in Cleveland. Under the freedom of choice plan, tenant assignment policies on their face have been administered without any considerations based on race. However, given the importance of estate managers with CMHA's system and given the fact that the racial composition of estate managers mirrors the racial makeup of the estate population, discrimination may well be practiced daily throughout the estates. CMHA has an affirmative duty to integrate its housing projects and to be instrumental in dispersing urban housing patterns. The Fair Housing Act of 1968, 42 U.S.C. § 3601 et seq. in establishing a national policy of fair housing throughout the United States carried with it the clear implication that

local housing authorities in conjunction with Federal agencies responsible for housing programs are to affirmatively institute action the direct result of which was to be the implementation of the dual and mutual goals of fair housing and the elimination of discrimination in that housing. Gautreaux v. Chicago Housing Authority, 265 F.Supp. 582 (1967), 296 F.Supp. 907 (N.D.Ill.1969), aff'd. 436 F.2d 306 (7th Cir. 1970) cert. den. 402 U.S. 922, 91 S.Ct. 1378, 28 L.Ed.2d 661 (1971); Hicks v. Weaver, 302 F. Supp. 619 (E.D.La.1969); Shannon v. United States Department of HUD, 436 F.2d 809 (3rd Cir. 1970). Therefore, the failure of the housing authority to include any racial criteria in determining site selection constitutes a violation of the Fourteenth Amendment. Since Cleveland is so badly divided on racial lines, CMHA must indicate why there is a need to continue the development of public housing units, especially *scattered site units*, in the racially impacted areas on the East Side of Cleveland. These areas include all five sections of the eight sector map on the East Side of the Cuyahoga River.

■ The conduct of CMHA in failing to desegregate all aspects of its public housing program, including the population of presently existing units and the planning of scattered sites violate the Fourteenth Amendment to the United States Constitution. Hicks v. Weaver, 302 F.Supp. 619 (E.D.La.1969); see Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189.

■ The actions of CMHA in failing to place a clear majority or all of its new public housing units in White neighborhoods and largely on the west side of the City in light of the racial composition of the waiting list for family units constitutes a violation of 42 U.S.C. §§ 1981, 1983, 2000d and 3601 et seq. Gautreaux v. Chicago Housing Authority, 265 F.Supp. 582 (N.D.Ill.1967), 296 F. Supp. 907 (1969), aff'd. 436 F.2d 306 (7th Cir. 1970), cert. den. 402 U.S. 992, 91 S.Ct. 1378, 28 L.Ed.2d 661 (1971); Shannon v. United States Department of

HUD, 436 F.2d 809 (3rd Cir. 1970); Blacksheer Residents Organization v. Austin Housing Authority (W.D.Tex. 1971). See also, site selection criteria regulations, Department of Housing and Urban Development, 37 F.R. 203 (January 7, 1972).

■ CMRA has contended that in order to prove their case on the merits, the plaintiffs must show that the Housing Authority had directly or indirectly intended to discriminate or that they have a motive to discriminate. If this standard were to be applied, it would be very difficult to prove a violation in a civil rights case. Actual intent or motive need not be proven, Hawkins v. Town of Shaw, Mississippi, 437 F.2d 1286 (5th Cir. 1971), for . . . " 'equal protection of the law' means more than merely the absence of governmental action designed to discriminate." Norwalk Core v. Norwalk Redevelopment Agency, 395 F.2d 920, 931 (2d Cir. 1968). See also Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281 (1939). As Mr. Justice Clark stated in Burton v. Wilmington Parking Authority, 365 U.S. 715, 725, 81 S.Ct. 856, 861, 6 L.Ed.2d 45 (1961): "It is of no consolation to an individual denied the equal protection of the laws that it was done in good faith." See Gaston County, North Carolina v. United States, 395 U.S. 285, 89 S.Ct. 1720, 23 L.Ed.2d 309 (1969) (voting rights); Meredith v. Fair, 298 F.2d 696 (5th Cir. 1962) (education); United States v. I. B. E. W., Local 38, 428 F.2d 144 (6th Cir. 1970) (employment).

■ The low-income housing cases, cited by plaintiffs, certainly countenance the view that discriminatory actions may be judged by their effect, and not necessarily by an actual intent to discriminate. Judge Austin, in *Gautreaux*, found significant the fact that except for four projects with quotas for Black residents almost all the tenants in projects controlled by the Chicago Housing Authority were Black and the overwhelming majority of the family units under the jurisdiction of Chicago Housing Authority were located in Black areas. He stated:

"It is incredible that this dismal prospect of an all Negro public housing system in all Negro areas came about without the persistent application of a deliberate policy to confine public housing to all Negro or immediately adjacent changing areas." 296 F.Supp. at 910.

This sentence applies most directly to the case at bar.

As Judge J. Skelly Wright put it, in what has become and oft-quoted phrase:

"Whatever the law was once, it is a testament to our maturing concept of equality that, with the help of Supreme Court decisions in the last decade, we now firmly recognize that the *arbitrary quality of thoughtlessness can be as disastrous to private rights and to the public interest as the perversity of a willful scheme.*" (Emphasis supplied.)

Hobson v. Hansen, 269 F.Supp. 401, 497 (D.D.C.1967), aff'd *sub nom.*, Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F.2d 175 (1969) (*en banc*).

The leading low-income public housing case is Gautreaux v. Chicago Housing Authority, 265 F.Supp. 582 (N.D.Ill. 1967); *Gautreaux* has been in litigation for more than seven years and covers almost every facet of the problem of public housing. Low-income public housing in the City of Chicago is completely segregated. No public housing has been constructed in White wards in Chicago. This policy can be traced directly to the practice of allowing city aldermen to exercise a veto over the selection of sites in their respective wards. Judge Austin recently enjoined this practice. Gautreaux v. Chicago Housing Authority et al., 342 F.Supp. 827 (N.D.Ill., 1972). Fortunately, this practice does not exist in Cleveland. See Davis et al. v. City of Toledo, 54 F.R.D. 386 (N.D.Ohio, 1970).

In Gautreaux I, 265 F.Supp. 582, the Court granted CHA's motion to dismiss

for failure to allege intentional discriminatory site selection. This was remedied in Gautreaux II, 296 F.Supp. 907 (1969). The intentional discrimination, the Court held, resulted from the councilmanic veto which, at least in certain instances, was racially motivated.

CMHA does not utilize quota in tenant assignments and does not engage in a preclearance procedure which could result in a racially motivated veto of sites, as did the Chicago Housing Authority. It is CMHA's policy not to confine public housing to all-Negro neighborhoods. Approximately one-half of all public housing units built in the last five years have been in White neighborhoods, and many of CMHA's older projects which are now substantially Negro were in White neighborhoods when built.

This raises one of the most difficult points in the case. It seems unfair to blame the "sins" of the past members of CMHA on the present members. We cannot and should not blame the present CMHA board for what may have been the shortsightedness of past CMHA boards. The issue before the Court is whether CMHA's conduct in continuing to select sites for public housing in racially impacted areas and in maintaining what has become a racially segregated system violates the Fourteenth Amendment. This calls for a determination of de facto rather than de jure discrimination. Crow v. Brown et al., *supra*, is clearly in point. The Court there ordered the County Commissioners to issue the building permits in question and enjoined the county officials from further interference with public housing, but the Court denied the request for relief against the Atlanta Housing Authority. The plaintiffs sought injunctive and declaratory relief against AHA on the ground that it had continued to promote racial concentration in public housing and had not vigorously attempted to induce Fulton County to issue a building permit and improve municipal services for a particular public housing site. Relief against the Atlanta Housing Authority was denied because, unlike CMHA, the evidence there indicated that better

than 93% of all units proposed by AHA were to be built in census tracts that were 80%–90% White. The Court went on to note that AHA's present desire was to disperse public housing. CMHA's acknowledged goal is the dispersal of public housing. Dispersal of public housing can mean many things to many people. To some it could mean the equal dispersal of each type of housing, beginning with the present type of housing, scattered site family housing. To others, including this court, dispersal of public housing means that if historically housing has been built primarily in one area or section of the city, housing must be built in other areas or sections of the city until such time as all the public housing in the city is dispersed. By this method, given an energetic housing authority, a cooperative city and cooperation from the federal housing agencies, it is possible that dispersal of housing could be accomplished within a reasonable time. Under the first method discussed, dispersal of public housing would most likely never be achieved and we will have left the next generation only a potential law suit, rather than an integrated community. Therefore, the most appropriate way of dispersing public housing, especially scattered site, is to put a very large percentage of it on the west side of the City and continue to place it there until a substantial portion of the population of the west side is Black, or at least until the tipping point is approached See Note, Racial Discrimination in Public Housing Site Selection, 23 Stan.L.Rev. 63, 135–136 (1970); Recent Cases, 85 Harv.L.Rev. 870, 876 (1972); Gautreaux v. Chicago Housing Authority, 304 F. Supp. 736, 739–740 (N.D.Ill.1969) (judgment order). See generally, Navasky, The Benevolent Housing Quota, 6 How. L.J. 30 (1960); Weaver, Class, Race and Urban Renewal, in Racial and Ethnic Relations 331 (B. Segal ed. 1966).

Thereafter, CMHA could evenly disperse any new projects about the City in order to continue the racial balance such efforts would have reaped. However, it is recognized that 2500 homes housed largely with Blacks and placed on the

west side of the Cuyahoga River will not integrate Cleveland overnight. It is also clear that scattered-site housing is not the only way of resolving the City's need for low-income housing or for supplying sufficient minority housing opportunities. See United States v. West Peachtree Tenth Corporation, 437 F.2d 221 (5th Cir. 1971), cf. Shannon v. United States Department of HUD, 436 F.2d 809 (3rd Cir. 1970). However, this Court can only deal with the issues that come before it and will pursue this no farther.

One of the problems facing CMHA is the fact that many Whites do not desire to live on the east side and many Blacks are uncomfortable with the thought of living on the west side. Within the framework of their freedom of choice plan, CMHA must act as affirmatively as they can to act as real estate brokers to convince east side residents to move into scattered-site homes on the west side. CMHA and the Administration of the City of Cleveland are charged with the leadership of this proposal to integrate housing patterns in Cleveland. Since CMHA is charged with the building of public housing, it is their duty to devise appropriate policies and plans in this area. It is the obligation of the City to support CMHA, to encourage them in every way, and to aid in the integration of the housing patterns of the City with all its strength.

It seems clear that there is a reasonable probability of plaintiffs' success on the merits in both counts of the complaint. The plaintiffs and the class they represent have suffered and, even with this injunction, will continue to suffer the loss of safe, sanitary, decent and integrated housing; the loss of achieving integrated schools without the necessity of massive busing; the loss of housing which is accessible to jobs; and the loss of being unable to escape the never-ending and seemingly unbreakable cycle of poverty. In addition as each day passes, opportunities vanish, vacant land diminishes and potential builders become discouraged. The mere fact that a severe infringement on the plaintiffs' Fourteenth Amendment rights has been substantially proven is proof enough of irreparable injury. See Henry v. Greenville Airport Commission, 284 F.2d 631 (4th Cir. 1960); Clemons v. Board of Education of Hillsboro, Ohio, 228 F.2d 853 (6th Cir. 1956). Cf. Wilson v. Board of Supervisors of Louisiana State University, etc., 92 F.Supp. 986 (E.D.La. 1950).

When faced with a violation of Constitutional rights, the task of balancing the equities seems futile. Only an extremely substantial interest could be balanced against this violation and none has been presented, nor has any evidence been introduced to indicate that such a substantial interest exists.

The plaintiffs have requested mandatory preliminary relief to restore the status quo in this case. The status quo in this case is not the situation which existed on the day the complaint was filed or on the date of the hearing. The status quo existed before the building permits were revoked and when CMHA was processing acceptable sites. See District 50, United Mine Workers of America v. International Union, United Mine Workers of America, 134 U.S. App.D.C. 34, 412 F.2d 165 (1969); Westinghouse Electric Corporation v. Free Sewing Machine Co., 256 F.2d 806 (7th Cir. 1958). Cf. Toledo A.A. and N.M. Railway Company v. Pennsylvania Company, 54 F. 730, 731 (C.C.N.D.Ohio, 1893).

The normal status for CMHA and the builders of its projects is the planning and building of low income housing. Because of certain actions by the defendant City and its agents, CMHA has been unable to adequately do its job and because CMHA can not do its job the plaintiffs and their class are being victimized.

Accordingly, it is ordered that CMHA and defendant Fitzgerald are enjoined from planning any future public housing in Negro neighborhoods of the city of Cleveland. This prohibition shall include further planning and construction of scattered site public housing units. Any

plans on sites which have been acted upon by CMHA are not covered by this injunction. These sites are few in number. In addition, the eight-sector map is not to be followed. CMHA shall consider only sites on the West Side of the Cuyahoga River in its scattered site program and is enjoined from the consideration of any East Side sites in this program. The question of the racial composition of the estate managers is left to the hearing on the permanent injunction.

DISTRIBUTION GUIDE
FOR
500 PROPOSED CMHA
FAMILY DWELLINGS

CUYAHOGA METROPOLITAN HOUSING AUTHORITY