**MIDDLESBORO HOUSING AUTHORITY, Appellant,**

v.

**KENTUCKY COMMISSION ON HUMAN RIGHTS and Ricardo Sisney, Commissioner, Appellees.**

Court of Appeals of Kentucky.

June 10, 1977.

William A. Watson, Watson & Watson, Middlesboro, for appellant.

Thomas A. Ebendorf, Compliance Director, The Kentucky Commission on Human Rights, Louisville, Robert F. Stephens, Atty. Gen., Frankfort, for appellees.

Before HOWERTON, GANT and PARK, JJ.

HOWERTON, Judge.

This action originated with the filing of two complaints with the Kentucky Commission on Human Rights alleging unlawful practices of racial discrimination in municipal housing by the Middlesboro Housing Authority.

On October 3, 1973, Rose Buckner, a black female temporarily residing in Middlesboro, Kentucky, filed a complaint with Appellee alleging the unlawful practice of racial discrimination by the Appellant. The Buckner complaint was subsequently dismissed because the party did not have standing to secure public housing in Middlesboro. On May 23, 1974, Ricardo Sisney, a commissioner of the Kentucky Commission on Human Rights, filed a similar charge pursuant to the authority granted him by KRS 344.200(1). The complaint also alleged that the Appellant was maintaining public housing projects segregated by race which constituted "a pattern and practice" of racial discrimination in violation of KRS 344.360.

Administrative hearings were conducted on May 31, 1974, and again on November 15, 1974, at which time the hearings were concluded. On September 22, 1975, the Appellee issued its findings of fact, conclusions of law and order holding that the policies and practices of the Appellant had resulted in the segregation by race of the public housing projects under Appellant's control, in violation of Kentucky statutes.

The Appellant sought judicial review in the Bell Circuit Court. On May 26, 1976, the circuit court dismissed the appeal and affirmed the Commission's Order on the basis of the limits of judicial review. It is from the Order of the circuit court that the Appellant has filed this appeal.

The Commission's findings of fact, conclusions of law and Order are the focal points of controversy in this litigation, and since the essential facts are set forth in the document, it will be quoted, at this point, in its entirety.

.    .    .    .    .

## FINDINGS OF FACT

1. Complainant Buckner who filed complaint No. 158–H on October 3, 1973, alleging discrimination against herself individually and a general pattern and practice of discrimination by Respondent Middlesboro Housing Authority, was found on investigation not able to meet resident requirements of the Authority. A finding of "no probable cause" was made as to her individual complaint, and it was dismissed by the Commission.

   Complaint Buckner's complaint of a general pattern and practice, on which the staff made an initial finding of probable cause, was consolidated at the beginning of this hearing with the Commissioner complaint of Commissioner Sisney, No. 175–H filed May 24, 1974.

2. Complainant Sisney is a Commissioner of the Kentucky Commission on Human Rights and he filed a complaint pursuant to KRS 344.200 and HR–2 020(b).

3. Respondent, Middlesboro Housing Authority, at all times mentioned herein; maintained, operated, and controlled and continues to maintain, operate, administer and control the public housing projects in Middlesboro, Kentucky.

4. Racial composition of these housing projects at the time the complaints were filed and at the commencement of the hearing was as follows:

| Name | Construction Date | Blacks | Whites |
|------|-------------------|--------|--------|
| K–19–1 (Pinnacle) | 1953 | 0 | 76 |
| K–19–2 (Lincoln) | 1953 | 24 | 0 |
| K–19–3 Rennie Gayles | 1966–67 | 18 | 0 |
| K–19–3 Three Scattered Sites | 1966–67 | 0 | 82 |
| K–19–4 Noetown | 1970 | 0 | 100 |
| K–19–5 (Under construction) | | (60 Units) | |

5. The original policy of the Middlesboro housing authority [sic] was to segregate its housing on the basis of race, and to place a tenant only in housing assigned to persons of his race.

6. From 1965 to 1968 the policy was changed to one of so-called "freedom of choice". Applicants were asked to indicate which housing projects they would accept and which they would refuse. They were not offered housing unless a unit was available in a project of their choice.

7. From 1968 down to the present, the policy of the Housing Authority has been one of "limited freedom of choice" or the "three-refusals policy". As a housing unit is available it is offered to the tenant having the highest preference [sic] and priority of application, but the tenant may refuse it (and automatically any subsequent vacancies in that project "location") without losing his position of preference and priority on the waiting list. Only if the applicant refuses *three* such project "locations" is he penalized by having his name placed at the end of the waiting list.

8. The present policy of the Authority enables a white applicant to refuse housing in both the locations that are all-black without being penalized. The present policy of the Authority enables a black applicant to refuse three all-white projects without being penalized, leaving only one chance in three that the crucial fourth offer would be in white housing.

9. A study of the records of the Authority by the staff of the Kentucky Commission on Human Rights revealed a number of cases in which white applicants were offered housing in all-white projects before blacks who were higher on the waiting list, and other cases where blacks were offered housing in all-black projects ahead of whites who were higher on the waiting list. Although a witness for the Authority in rebuttal testified that some of these apparent violations of the policy were due to inadequacies of record keeping, lack of information or misinformation on priority status of applicants, preference for telephone over mail for making offers, and the use of an "inactive" file for some applications, there is substantial evidence that the employees of the Au-

thority in some instances failed to follow even its stated policy—one of almost unlimited freedom of choice under the "three-refusal" policy.

10. As a result of the aforesaid policies and practices the racial composition of Respondent's aforesaid public housing projects were and are segregated by the race of the tenants thereof.

## CONCLUSIONS OF LAW

1. Respondent Authority is a "real estate operator" as defined by KRS 344.010(7), engaged in the business of renting or leasing real estate.

2. Because of its tenant selections and assignment policies, procedures, and practices Respondent has maintained and continues to maintain public housing projects under its supervision, direction and control in which the tenants are segregated by their race, an unlawful practice in violation of KRS 344.360.

3. The Kentucky Commission on Human Rights has exclusive primary jurisdiction of a claim arising under KRS Chapter 344 and as such has the power to fashion an adequate and complete remedy.

4. The Kentucky Commission on Human Rights has the power to require Respondent to take such affirmative action as in its judgment will carry out the purpose of KRS Chapter 344. Said affirmative action may include but is not limited to:

a. requiring Respondent to change its tenant selection and placement procedures so as to eliminate unlawful practices in violation of KRS 344.-360.

b. advertise that Respondent has a policy of "Equal Housing Opportunity" and circulate this information to the black community of Middlesboro.

c. requiring Respondent to report to the Kentucky Commission on Human Rights giving information on the racial composition of applicants, tenants and projects.

5. Imposition of a ratio remedy is appropriate, and the Commission has the authority to so order.

## ORDER

IT IS THEREFORE ORDERED that Respondent, Middlesboro Housing Authority, its agents, servants, employees and each of their respective successors cease and desist from the unlawful practice of discrimination against individuals because of race or color.

IT IS FURTHER ORDERED that Respondent cease and desist from employing its present tenant and [sic] selection and assignment procedures.

IT IS FURTHER ORDERED that Respondent post and maintain the "Equal Housing Opportunity" poster prepared by the Kentucky Commission on Human Rights in conspicious [sic] places in every housing project and in every project office where it may be easily seen and read by every tenant and applicant.

IT IS FURTHER ORDERED that as vacancies occur Respondent shall extend to all current tenants an invitation to transfer from their present unit to a vacant unit in a project in which the racial composition of the project reflects a lower percentage of the tenant's race than is reflected among the occupants of all projects within the Housing Authority.

IT IS FURTHER ORDERED that Respondent, after first accommodating existing tenants as outlined in the preceding paragraph, shall plainly state in public advertisement that its accommodations will be assigned under a plan to attain desegregation in all projects.

IT IS FURTHER ORDERED that Respondent shall cease and desist from leasing housing accommodations to white families in those projects which reflect a higher percentage of whites than in all public housing projects of the Respondent and to black families in those projects which reflect a higher percentage of blacks than reside in all public housing projects of the Respondent until such time as the racial composition of each project reflects the ratio of black to white

tenant families in all projects. Provided however, that if in implementing the above ratio it is necessary for Respondent to maintain a vacancy in a project which could otherwise be filled by a qualified applicant whose occupancy will not contribute to desegregation, then Respondent may, if it believed the continued maintenance of a vacancy will create an undue hardship upon Respondent, apply to the Commission for a waiver and the Commission may waive the application of this provision and permit the vacancy to be filled.

IT IS FURTHER ORDERED that Respondent shall develop and submit to the Kentucky Commission on Human rights [sic] for its approval within thirty (20) [sic] days of the effective date of this order, an affirmative action program designed to achieve in Respondent's public housing projects the racial composition set forth above and upon obtaining said approval, shall forth with [sic] effectuate said program.

IT IS FURTHER ORDERED that Respondent shall adopt, maintain and implement a policy of insuring that the racial composition of each of Respondent's public housing projects reflects the ratio of black to white tenant families in all public housing projects under Respondent's supervision, direction and control.

IT IS FURTHER ORDERED that Respondent shall provide the Kentucky Commission on Human Rights every three (3) months for a period of five (5) years from the date of this order with a report showing the name, address, number of bedrooms in the unit, family size, date of application, and preference accorded the applicants, date of offer and date of lease of all new tenants in each of Respondent's projects for the previous three (3) months.

IT IS FURTHER ORDERED that Respondent shall provide the Kentucky Commission on Human Rights every three (3) months for a period of five (5) years from the date of the order with a report showing name, new address, number of bedrooms in the new unit, number of bedrooms in former unit, family size, race and date of transfer of all tenants who transferred housing accommodation in the projects for the previous three (3) months.

IT IS FURTHER ORDERED that Respondent shall provide reports to the Kentucky Commission on Human Rights every three (3) months for a period of five (5) years from the date of this order showing the racial composition of each public housing project and the ratio of black families to white families in the combined total of all projects under Respondent's supervision, direction and control.

IT IS FURTHER ORDERED that Respondent shall seek to place a Black on the Middlesboro Housing Authority Board in the first vacancy which shall occur and shall at all times maintain at least one Black representative on the Board; and that Respondent shall seek to obtain a Black office employee for the first vacancy which shall occur and shall at all times maintain at least one Black office employee.

This the __22nd__ day of September, 1975.

.        .        .        .        .

After reviewing and considering the record, the applicable law, and the arguments of counsel, this court must also accept each and every one of the ten findings of fact. Where the findings of fact of the Kentucky Commission on Human Rights are supported by substantial evidence, they are conclusive under KRS 344.240. Although the evidence is conflicting in part, there is substantial evidence of probative value to support the findings and they are not clearly erroneous. This is not to say, however, that there are sufficient facts to support each and every portion of the Order or to give the broadest meaning which could be given to the Commission's conclusions of law. We concur with some and we disagree with others.

The real questions raised by the Appellant are primarily addressed to the points of

whether or not the Appellant, Middlesboro Housing Authority, has been engaged in an unlawful practice of discrimination, and whether or not the Appellee may dictate a quota-remedy.

Appellant defends the past practices of tenant selection by assuring the court that there was no intention to maintain segregated housing. The Appellant also attacks the Order of the Appellee by contending that the Appellee did not prove a willful, malevolent or invidious practice by the Authority.

Bad faith or discriminatory intent do not appear to be necessary elements for violation of KRS Chapter 344. KRS 344.010(4), reads:

"Discrimination" means any direct or indirect act or practice of . . . segregation . . . or any other act or practice of differentiation or preference in the treatment of a person or persons because of race . . . .

KRS 344.360 provides, in part, as follows: 344.360. Unlawful Housing Practices. It is an unlawful practice for a real estate operator, or for a real estate broker, real estate salesman, or an individual employed by or acting on behalf of any of these:

(1) to refuse to . . . lease or otherwise deny to or withhold real property from an individual because of his race . . . .;

\* \* \* \* \* \*

(3) to refuse to receive or transmit a bonafide offer to . . . lease real property from an individual because of his race . . . .;

\* \* \* \* \* \*

(8) to otherwise deny or to withhold real property from an individual because of his race . . . .

■ Racial discrimination may be shown by proof of either discriminatory purpose or discriminatory effect. *Griggs v. Duke Power Company,* 401 U.S. 424 at 432, 91 S.Ct. 849 at 854, 28 L.Ed.2d 158 (1971) was an employment case in which the Supreme Court stated, "Good intent or absence of

discriminatory intent does not redeem employment procedures that operate as 'built-in headwind' for minority groups . . ." Actual intent or malevolent motive would be difficult to prove in any civil rights action, and they need not be proven. See also, *Banks v. Perk,* 341 F.Supp. 1175 (E.D. Ohio 1972) and *Hawkins v. Town of Shaw, Mississippi,* 437 F.2d 1286 (5th Cir. 1971).

In *Banks v. Perk, supra,* the court, after ruling that intent could not be the standard by which discriminatory conduct is judged, went on to note that:

Any municipal action or inaction overt, subtle or concealed which perpetuates or reasonably could perpetuate discrimination, *especially in public housing,* cannot be tolerated. (Emphasis added)

Statistics often speak loudly, and courts listen. In *United States v. Reddoch,* 467 F.2d 897 (5th Cir. 1972), Reddoch was an owner of a large apartment complex. Several black applicants had applied for occupancy, and had filed a charge of racial discrimination. Although there had been a 100% turnover in the units during the past several years preceding the trial, no black applicant had ever secured housing in the complex. The court stated that "Nothing is as emphatic as zero" (citing *United States v. Hinds County Board of Education,* 417 F.2d 852, 858 (5th Cir. 1969) ).

■ The Appellant has provided zero integration and this fact strongly supports a finding of discrimination. Mere segregation is not unlawful or discriminatory, but practices and procedures which tend to perpetuate segregation in public housing are unlawful. The Appellee found in its second conclusion of law that because of its tenant selection and assignment policies, procedures and practices, Appellant has maintained and continues to maintain public housing projects under its supervision in which tenants are segregated by their race which is an unlawful practice in violation of KRS 344.360. We, therefore, concur with this finding and add that it is also supported by the specific findings in item no. 9 of the findings of fact. Finding no. 9 pro-

vided that some white applicants were offered housing in all-white projects before blacks who were higher on the waiting list, and some blacks were offered housing in all-black projects ahead of whites who were higher on the waiting list. We agree with the Appellee that all of these violations cannot be explained by inadequate record keeping, lack of information on priority status, preference for telephone over mail in making offers, and the use of an "inactive" file for some applications.

Although most tenants are undoubtedly satisfied with the project in which they live, it is nevertheless incredible that there has been absolutely no integration of the projects. The "three refusal" policy has provided almost unlimited freedom of choice and guaranteed segregated housing.

When an unlawful violation of KRS Chapter 344 has been determined, the Appellee not only has jurisdiction of the claim, but does have broad powers to provide an adequate remedy as set out in conclusion no. 3, at least within reasonable limits. We further agree with Appellee's first conclusion that the definition of a real estate operator in KRS 344.010(7) would clearly include the Appellant. Also the provisions of KRS 344.230 authorize the Appellee to take all of the affirmative action set out in item no. 4 of the conclusions.

As to the Order, we can therefore clearly accept those portions directing the Appellant to cease and desist from unlawful discrimination and from the present method of tenant selection. We also approve of those portions of the Order requiring an affirmative action program, the posting of notices and the submission of reports, although on remand the Commission should consider the adequacy of receiving copies of Appellant's periodic reports to the United States Department of Housing and Urban Development.

The Appellee also provided in conclusion no. 5, "Imposition of a ratio-remedy is appropriate and the Commission has the authority to so order." This is the basis for the next area of controversy and involves not only the question of whether or not the Appellee may establish a quota remedy, but, if so, whether the ratio-remedy provided for in this case is reasonable, necessary, and based on adequate facts.

The question of whether or not the Kentucky Human Rights Commission can impose a ratio-remedy in a housing discrimination case is new to Kentucky. Although quota remedies have been used to resolve racial discrimination problems in such areas as employment and schools, there have been very few decisions relating to this problem and remedy in housing.

In *Otero v. New York Housing Authority*, 484 F.2d 1122 (2nd Cir. 1973), the court was faced with a problem of self-imposed quotas established by the New York Housing Authority to insure desegregation and racial balance. In that case, the court stated at 1140:

> The Authority may limit the number of apartments to be made available to persons of white or non-white races, including minority groups, where it can show that such action is essential to promote a racially balanced community and to avoid concentrated racial pockets that will result in a segregated community.

The *Otero* case creates a precedent for the imposition of quotas as they relate to the leasing of units in the future. The case of *Taylor v. City of Millington*, 476 F.2d 599 (6th Cir. 1973) did not approve or deny a ratio-remedy in housing, but it did express doubt as to the propriety of ordering such a remedy which would uproot present tenants. We would point out at this time that the remedy offered by the Appellee applies only to future tenants or voluntary moves by present tenants.

The case that provides the strongest authority for a ratio-remedy to be imposed by a Human Rights Commission is *Pennsylvania Human Relations Commission v. Chester Housing Authority*, 458 Pa. 67, 327 A.2d 335 (1974). The Pennsylvania Human Relations Commission was established and empowered by a statute somewhat comparable to Chapter 344 of the Kentucky Revised Statutes. The Pennsylvania Court upheld

the right of the Pennsylvania Human Relations Commission to impose a quota-remedy to accomplish racial desegregation in public housing.

The purposes of Chapter 344 are set forth in KRS 344.020. The statute provides as follows:

344.020. Purposes of Law, Construction —Effect.

(1) The general purposes of this chapter are:

(a) to provide for execution within the state of the policies embodied in the Federal Civil Rights Act of 1964 (78 Stat. 241) [title VIII of the Federal Civil Rights Act of 1968 (82 Stat. 81), and the Federal Age Discrimination in Employment Act of 1967 (81 Stat. 602)];

(b) to safeguard all individuals within the state from discrimination because of race . . .; thereby to protect their interest in personal dignity and freedom from humiliation, to make available to the state their full protective capacities, to secure the state against domestic strife and unrest which would menace its democratic institutions, to preserve the public safety, health and general welfare, and to further the interests, rights and privileges of individuals within the state;

\* \* \* \* \* \*

(2) This chapter shall be construed to further the general purposes stated in this section and the special purposes of the particular provisions involved.

\* \* \* \* \* \*

The Federal Civil Rights Act of 1964 prohibits discrimination in federally assisted housing, which is the type facility operated by Appellant. Title VIII of the Civil Rights Act of 1968 provides for states to establish substantially equivalent laws in the field of discrimination and it defers the authority for action on complaints to agencies of such states. Clearly, the Appellee has jurisdiction over this particular Appellant.

A quota remedy is not prohibited by any Kentucky statute, case law or the Constitution. Our so-called "color-blind" U.S. Constitution has also taken race-conscious action to avoid illegal state action which tended to be discriminatory. Examples of this appear in *Norwalk CORE v. Norwalk Redevelopment Agency*, 395 F.2d 920 (2nd Cir. 1968) on dislocations from Urban Renewal, and *El Cortez Heights Residents and Property Owners Association v. Tucson Housing Authority*, 10 Ariz.App. 132, 457 P.2d 294 (1969) on site selection procedures. See also, *Shannon v. HUD*, 436 F.2d 809 (3rd Cir. 1970).

We conclude that among Appellee's arsenal of remedies is the use of quotas. The imposition of a quota-remedy, however, may have drastic consequences on both the landlord and tenants, present and future, and no such remedy will be approved where the remedy proposed is not itself supported by substantial evidence and findings of fact which indicate the relevant problems have been considered, that such a remedy is needed to correct the situation which exists, and that the prescribed method is workable.

The Human Rights Commission has established through its findings of fact that there is a need to require affirmative action by the Appellant to correct discriminatory practices and to achieve some balance of integration in its public housing facilities. The Appellee has not, however, indicated through its findings of fact that any consideration has been given to the rights and needs of the tenants. Tenants may not be parties to this litigation, but their rights will be affected just as the rights of children are affected by a dissolution of a marriage.

Likewise, there is nothing in the findings to indicate that the Appellee has considered any recommendations by the Appellant or the consequences of its proposed remedy on the operation of the housing projects. See, for example, KRS 80.010 as it defines the purposes of public housing; KRS 80.190 and KRS 80.240 as they relate to income and the application of receipts; KRS 80.200 as it relates to rentals and priorities in tenant selections, and KRS 80.230 as it relates to

the funding of projects through the sale of revenue bonds.

A legal justification for a quota-remedy would require an assertion that such controls are necessary to serve those preferring integrated housing. The record in this case is void of evidence to support any contention that a quota system is essential to achieve desirable integration.

Appellee has ordered the Appellant to cease renting to whites in white projects until each such project attains 14 percent black occupancy, which is the present percentage of black occupancy in all projects. Also, the Order requires Appellant to cease leasing units to blacks in black projects until a ratio of 86 percent white and 14 percent black is attained. These hard and fast figures seem to be somewhat both "access" and "integration" quotas as they set a minimum and maximum limit for whites in black projects and for blacks in white projects. There is no evidence in the record to cause one to suspect that such percentages might realistically be achieved, or that this particular result is necessary or desirable.

Appellee's Order also proposes that as vacancies occur, Appellant shall invite current tenants to transfer to a vacant unit in a project where the racial composition reflects a lower percentage of the tenant's race. This sounds nice but is unrealistic. A blanket request to have interested families sign up for such moves would be appropriate and workable; but to extend invitations to all tenants to transfer as vacancies occur, which appears to be the intent of the Order, is time consuming and unreasonably costly, both as to notices and delays in filling vacancies. Some delays, however, are and may be part of a legitimate remedial effort to overcome the effects of housing discrimination.

The Order also requires the Appellant to insure that the racial composition of each project reflects the ratio of black to white tenant families in all public housing projects under Respondent's supervision, direction and control. This directive illustrates another deficiency in the findings by the Appellee. No consideration was given to the number of applications or to changes in future housing demands. Current occupancy is a consideration, but it may not be a sole criterion.

On remand, the Appellee should consider alternatives to quotas while attempting to justify a need. Quotas should be a last resort remedy. Alternatives to promote integration and to eliminate discrimination have already been provided in part by the Order to cease the "three refusal" option and to use a first-come, first-served, no refusal option. This plan allows for such considerations as required priorities and the size of units available. The plan does not, however, make any allowance for the establishment of criteria to permit a refusal when one is offered a unit, but is absolutely unable to accept and move at that time, without going to the bottom of the list. This would be a desirable consideration.

We note that KRS 344.200(4) provides, in part, "The Commission staff shall endeavor to eliminate the alleged unlawful practice by conference, conciliation and persuasion." The record does not indicate whether or not this effort was made. We also note, however, that Appellee's Order required the Appellant to "develop and submit . . . an affirmative action program" and then continued to direct how and to what extent desegregation was to be achieved. We believe the primary burden of designing a plan of desegregation should be on the Housing Authority, and only if the Authority fails in that duty should the Commission impose its own plan of desegregation. After all, the Appellant should know its own problems better, although the Appellee may and should "confer" and advise the Authority of what must be the objective and of what methods of desegregation have worked in other similar situations.

A recent decision by the Supreme Court of California is pertinent to the issues in this case. See, *Crawford v. Board of Education of the City of Los Angeles,* 17 Cal.3d 280, 130 Cal.Rptr. 724, 551 P.2d 28 (1976). In that case, the trial court had found that

although the schools in Los Angeles were severely segregated and were becoming increasingly segregated, the school board had failed to take any steps to alleviate the segregated condition. On the basis of such findings, the court ordered the defendant school board to prepare and implement a reasonably feasible plan for the desegregation of its schools. The court also attempted to define "segregated" schools in the terms of specific racial and ethnic percentages. The Supreme Court affirmed the order requiring the Board of Education to prepare and implement a plan, but it declared the trial court to be in error for specifying racial and ethnic percentages. The Court pointed out,

> The Constitution does not require a school board to achieve a particular or identical "racial mix" or "racial balance" in each school; rather, the Constitutional evil inheres in the existence of segregated schools. It is the elimination of such segregation and the harms inflicted by such segregation that is the ultimate Constitutional objective.

Because of the significance of the *Crawford* opinion to the issues in this case, we will take the liberty of presenting further quotations.

> . . . Experience has taught that the task of integration is an extremely complex one which entails much more than the assignment of specified percentages of pupils of different races or ethnic groups to the same school.

> In light of the realities of the remedial problem, we believe that once a court finds that a school board has implemented a program which promises to achieve meaningful progress toward eliminating the segregation in the district, the court should defer to the school board's program and should decline to intervene in the school desegregation process, so long as such meaningful progress does, in fact, follow. A court should, thus, stay its hand even if it believes that alternative techniques might lead to more rapid desegregation of the schools. We have

learned that the fastest path to desegregation does not always achieve the consummation, of the Constitutional objective; it may, instead, result in resegregation. In the absence of an easy, uniform solution to the desegregation problem, plans developed and implemented by local school boards, working with community leaders and affected citizens, hold the most promising hope for the attainment of integrated public schools in our state. (*Id.* 130 Cal.Rptr. at 727, 551 P.2d at 31.)

Although, as in *Crawford,* the school boards and, as in this case, Middlesboro Housing Authority, should clearly have the initial and primary responsibility for choosing between alternative methods for desegregation, the courts and Human Rights Commissions may nevertheless be required to play a vital role in enforcement of the rights of minorities. On pp. 741–742 of 130 Cal.Rptr., on pp. 45–46 of 551 P.2d of the *Crawford* opinion, the Court continued:

> The key to judicial deferment to the judgment of a local school board in this area, however, must lie in a school board's demonstration of its commitment to the necessity of immediately instituting reasonable and feasible steps to alleviate school segregation. If such a commitment is translated into on-going desegregation program [sic] which produces meaningful progress in the elimination of segregated schools, a court has reason to be confident that the Constitutional rights of minorities are not being ignored and that a quality desegregated education for all of a district's school children will be provided.

> If, however, a court finds that a local school board has not implemented such a course of action, the court is left with no alternative but to intervene to protect the Constitutional rights of minority children. Faced with a recalcitrant or intractable school board, a trial court may exercise broad equitable powers in formulating and supervising a plan which the court finds will insure meaningful progress to alleviate the harmful conse-

quences of school segregation in the district. When a local school board defaults in its Constitutional task, a court may no longer be justified in relying upon the board to implement programs which hold a reasonable promise for securing the rights of minority children.

Like the trial court in the *Crawford* case, the Human Rights Commission has undertaken to define "desegregation" in terms of racial ratios without first providing the Housing Authority an opportunity to satisfy its duty to provide a practical and feasible plan of desegregation. The Commission must rely upon the circuit courts of this state for enforcement of its orders. (KRS 344.240) The enforcement powers of the Commission are no greater than the equity powers possessed by the California trial court in the *Crawford* case. Consequently, we conclude that the holding of the California Supreme Court with respect to the powers and duty of the trial court in carrying out a plan of desegregation is equally applicable to the Kentucky Commission on Human Rights. Although the desegregation of public schools and the desegregation of public housing present different problems, the underlying principles are the same. The local Authority has the initial and primary responsibility and authority to formulate a feasible plan of desegregation. If the local Authority fails to produce or implement such a plan, the Commission is free to impose its own plan of desegregation.

This court will provide a liberal interpretation to the law in Chapter 344, but it will nevertheless look carefully at the work of any agency which acts with its personnel as the prosecutor, judge and jury. Judicial review is available to determine that not only the findings of fact are supported by substantial evidence, but also that the conclusions of law and the orders of administrative agencies are supported by substantial and appropriate facts, and that the conclusions and orders are not arbitrary and capricious. Although we have recognized Appellee's broad powers to eliminate segregation in public housing, including the power to impose a quota-remedy, we are confident that the legislature's delegation of authority to the Human Rights Commission does not justify the breadth of adjudicating or rulemaking as Appellee has attempted in this case without more fact finding and without first "conferring" with the Appellant. This court will not recognize in or grant to any such agency more discretionary power than is reasonably required to fulfill its legislative purposes.

We have concurred with the findings of fact and conclusions of law, including the fact that Appellant's segregated housing is a violation of law. We conclude, however, that the Commission was in error for establishing the quotas and specific ratios without additional findings and without first providing the Housing Authority the opportunity to present and try its own affirmative action program to desegregate its public housing. Therefore, on remand, the circuit court is directed to enter judgment placing the initial and primary burden of designing a plan of desegregation upon the Appellant. If the Appellant fails in that duty, or if the proposed plan is patently inadequate, the Appellee may impose its own plan of desegregation, including a ratio-remedy, subject to the basic requirements set forth in this opinion.

If a ratio-remedy is proposed, an excellent article providing an in-depth view of the pro's and con's of quota remedies appears in 26 Stanford Law Review 245. The 1974 article is entitled, "Integration for Subsidized Housing and the Question of Racial Occupancy Controls". The writing provides significant statistical data and discusses such problems as the "tipping phenomenon". The article concludes at page 309 with this statement: "In spite of the problems raised by any quota-type proposal, the approach offered in this article provides flexibility and safeguards for dealing with the sensitive issue of housing integration." The Appellee would be well-advised to consider the information in the article before proceeding to formulate a ratio-remedy.

■ Appellee's Order finally provides, "Respondent shall seek to place a Black on the Middlesboro Housing Authority Board in the first vacancy which shall occur and shall, at all times, maintain at least one Black representative on the Board. . ." This portion of the Order must be set aside and reversed on the ground that the Appellant is not the appointing authority for its Board members. The Mayor of Middlesboro is the appointing authority (KRS 80.-030) and he is not a party to this action.

The judgment of the Bell Circuit Court is therefore affirmed in part, reversed in part and remanded in part for further action consistent with this opinion.

All concur.