280 S.E.2d 653 (1981)
WEST VIRGINIA HUMAN RIGHTS COMMISSION etc., et al. and Wendell English, et al.
v.
UNITED TRANSPORTATION UNION, LOCAL NO. 655, et al.
WEST VIRGINIA HUMAN RIGHTS COMMISSION, etc.
v.
UNITED TRANSPORTATION UNION, LOCAL NO. 655, et al.
Nos. 14212, 14213.
Supreme Court of Appeals of West Virginia.
July 2, 1981.
Dissenting Opinion July 27, 1981.
*654 Chauncey H. Browning, Atty. Gen., and Gail Ferguson, Asst. Atty. Gen., Charleston, for W. Va. Human Rights Commission.
Henderson & Redd and Herbert H. Henderson, Huntington, for Wendell English, et al.
Preiser & Wilson, Donald R. Wilson and Fanny L. Haslebacher, Charleston, for appellees.
HARSHBARGER, Chief Justice:
Plaintiffs, seventeen black railway yardmen or former yardmen of the Norfolk and Western Railroad Company, charged their employer and United Transportation Union and its Local No. 655, their union, with racial discrimination. Their seniority system put blacks in inferior positions with lesser benefits.
A complaint was filed with the West Virginia Human Rights Commission on April 3, 1971, and subsequent complaints by other plaintiffs were consolidated for hearing. The railroad settled out, and James B. McIntyre, Hearing Examiner, heard the case against the unions in 1975. McIntyre filed elaborate "Recommended Findings of Fact and Conclusion of Law", in which he recognized violation of the West Virginia Human Rights Act and recommended certain remedies. The Commission decided facts (see Appendix), legal conclusions, and ordered remedies on August 27, 1976, but at defendants' request the Kanawha County Circuit Court vacated that order, relying on International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), and United Air Lines, Inc. v. Evans, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). The appeal was submitted for our decision on March 10, 1981.
Did the trial court err, finding that employment policies or practices that freeze employees into a status of prior discrimination but are neutral on their face, are lawful; that Section 703(h) of the federal Civil Rights Act, 42 U.S.C. § 2000e et seq. was imported into the West Virginia Human Rights Act, Code, 5-11-1 et seq.; and that defendants' acts are not continuing violations of our Act?

I.
Our Human Rights Commission is an administrative agency, its practices and procedures subject to judicial review. Code, 29A-1-1, et seq., Administrative Procedures Act; Currey v. West Virginia Human Rights Commission, W.Va., 273 S.E.2d 77 (1980). "As a general rule administrative findings of fact are conclusive upon a reviewing court, and not within the scope of its power to review, if the findings are supported by substantial evidence or are based upon conflicting evidence." City of Huntington v. State Water Commission, 137 W.Va. 786, 73 S.E.2d 833, 839 (1953). The substantial evidence rule for findings of fact applies to review of administrative agency decisions, and neither the parties nor the trial court have disagreed with the Commission's findings of fact. We find them supported by substantial evidence, and sustain them. (See Appendix.)

*655 II.
W.Va.Code, 5-11-1, et seq., The West Virginia Human Rights Act, enacted in 1967,
[D]eclares it "the public policy of the State of West Virginia to provide all of its citizens equal opportunity for employment" and "[e]qual opportunity in the areas of employment ... is hereby declared to be a human right or civil right of all persons without regard to ... [race]", Code, 5-11-2; State Human Rights Commission v. Pauley, W.Va., 212 S.E.2d 77, 79 (1975). The commission is responsible for "eliminat[ing] all discrimination in employment ... by virtue of... [race]". Code, 5-11-4. Currey v. W.Va. Human Rights Commission, W.Va., 273 S.E.2d 77, 79 (1980).
Unlawful discriminatory practices are defined in Code, 5-11-9:
It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification, or except where based upon applicable security regulations established by the United States or the State of West Virginia or its agencies or political subdivisions:
(a) For any employer to discriminate against an individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment if the individual is able and competent to perform the services required even if such individual is blind: Provided, that it shall not be unlawful discriminatory practice for an employer to observe the provisions of any bona fide pension, retirement, group or employee insurance, or welfare benefit plan or system not adopted as a subterfuge to evade the provisions of this subdivision;
.....
(c) For any labor organization because of race, religion, color, national origin, ancestry, sex, age or blindness of any individual to deny full and equal membership rights to any individual or otherwise to discriminate against such individuals with respect to hire, tenure, terms, conditions or privileges of employment or any other matter, directly or indirectly, related to employment.
The Legislature included a mandate that the Act "be liberally construed to accomplish its objectives and purposes", Code, 5-11-5.
Labor union liability is, therefore, defined in Code, 5-11-9(c), supra, forbidding unions from negotiating and signing racially discriminatory collective bargaining agreements having seniority systems that affect "tenure, terms, conditions or privileges of employment, or any other matter, directly or indirectly, related to employment." Seniority plans affect promotions, pay scales, vacations, preferential shifts, days off, retirement, pensions, layoffs, and recalls, all of which are "terms, conditions or privileges of employment." They are conceptually divided into two kinds: "benefit seniority" and "competitive-status seniority." W. Gould, Black Workers in White UnionsJob Discrimination in the United States, 67-92 (1977); J. Myers, The Scope and Implementation of Retroactive Competitive-Status Seniority Awards Under Title VII, 9 Seton Hall L.Rev. 655 (1978); Comment, Seniority Systems and the Duty of Fair Representation: Union Liability in the Teamsters Context, 14 Harvard Civil RightsCivil Liberties L.Rev. 711 (1979).
A union becomes responsible for any discrimination against individuals caused by prohibited classifications within a plan,[1] by *656 participating with an employer in negotiating and implementing such a seniority system. The United States Supreme Court recognized union liability for discrimination as early as 1944 in Steele v. Louisville & Nashville R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173, for exclusive bargaining representatives of a craft or class of railway employees under the Railway Labor Act; and in its per curiam reversal in Syres v. Oil Workers International Union, 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785 (1955), reh. denied, 350 U.S. 943, 76 S.Ct. 299, 100 L.Ed. 822 for National Labor Relations Act exclusive bargaining representatives.

III.
We get guidance about what causes a seniority system to be discriminatory from federal cases; and Title VII cases, Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2 et seq., provide persuasive reasoning.
In 1970, the United States Supreme Court denied certiorari in Local 189, United Papermakers & Paperworkers v. United States, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100. The Fifth Circuit Court of Appeals, 416 F.2d 980 (1969), had found an employer liable under Title VII because its policies renewed or exaggerated effects of past discrimination. Then the Court recognized that seniority systems can violate Title VII by perpetuating discriminatory practices even if there was no proof of intent and the practices were facially neutral. Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). See also Franks v. Bowman Trucking Co., 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976).
The Griggs rationale is consistent with the purpose of our State act to eliminate employment discrimination.[2] Current practices, regardless of intent, that operate to lock employees into a status fixed by prior discrimination by perpetuating its effects, violate the West Virginia Human Rights Act.
In International Brotherhood of Teamsters v. United States, supra, the Court reiterated its rule that facially neutral seniority systems can be unlawful if they continue past discrimination. But because Title VII contained a special provision immunizing *657 "bona fide" seniority systems, § 703(h),[3] the system was found not illegal.
Our Act does not immunize bona fide seniority systems, but only and specifically "bona fide pension, retirement, group or employee insurance, or welfare benefit plan[s]." Code, 5-11-9(a). Our Legislature had access to, and awareness of, the language and exemptions provided in Title VII when it adopted our Act, but although it chose to immunize bona fide "benefit" systems, it did not embrace in its list of exemptions "competitive-status" seniority systems that sustain discrimination. It chose to omit § 703(h) language.
One kind of practice "fair in form, but discriminatory in operation" is that which perpetuates the effects of prior discrimination. As the Court held in Griggs: "Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to `freeze' the status quo of prior discriminatory employment practices." 401 U.S., at 430, 28 L.Ed.2d 158, 91 S.Ct. 849 [853].

Were it not for § 703(h), the seniority system in this case would seem to fall under the Griggs rationale. The heart of the system is its allocation of the choicest jobs, the greatest protection against layoffs, and other advantages to those employees who have been line drivers for the longest time. Where, because of the employer's prior intentional discrimination, the line drivers with the longest tenure are without exception white, the advantages of the seniority system flow disproportionately to them and away from Negro and Spanish-surnamed employees who might by now have enjoyed those advantages had not the employer discriminated before the passage of the Act. This disproportionate distribution of advantages does in a very real sense "operate to `freeze' the status quo of prior discriminatory employment practices." (Emphasis added.) Teamsters v. United States, supra, 431 U.S., at 349-50, 97 S.Ct. at 1861-62 (footnote omitted).
See also California Brewers Assn. v. Bryant, 444 U.S. 598, 100 S.Ct. 814, 63 L.Ed.2d 55, 60 (1980).
These plaintiffs are in similar "frozen positions" as were those in Teamsters. They were denied promotions and consequently the same seniority as their white counterparts, because of their race. Their inferior rank persisted. No matter how neutral the seniority system appeared, it was not neutral because the discriminatory base into which employees originally were cast was thereafter always perpetuated.
After Teamsters, Federal District Court Judge Brown wrote that seniority systems in a UTU collective bargaining agreement with The Atchison, Topeka and Santa Fe Railway Company, nearly identical to ones challenged here, violated Title VII because they froze black employees "into the positions to which they were assigned by pre-Act discrimination, and ... operate[d] to deprive them of the `allocation of the choicest jobs, the greatest protection against layoffs, and other advantages ...' [citing Teamsters]." Sears v. Atchison, Topeka and Santa Fe Railway Company, 454 F.Supp. 158, 176-77 (D.Kan.1978). The seniority system was held not bona fide under the 703(h) exemption because it had its genesis in racial discrimination. It was "adopted and maintained during a period when segregation was standard operating procedure on the Santa Fe." Id., at 180. See Swint v. Pullman-Standard, 624 F.2d 525 (5th Cir. 1980), cert. granted, ___ U.S. ___, 101 S.Ct. 1972, 68 L.Ed.2d 293. Sears would find a violation here even if we had a *658 703(h)-type exemption in our statute for competitive-status seniority systems. We support its rationale wholeheartedly.
We are satisfied that the discriminatory status that prejudiced these plaintiffs does not exist for new black employees; but plaintiffs (some now retired) had rights to equal employment status with whites, Code, 5-11-2, denied; and only when they are allotted their rightful places on seniority rosters, will our human rights act requirements be satisfied.
Whites who throughout this process have gained unlawful advantage cannot complain because, as wrote the United States Fourth Circuit Court of Appeals (about N & W employees represented by this same union!): "The Norfolk and Western brakemen, whether black or white have no vested interest in their seniority that precludes the application of laws designed to eradicate racial discrimination." Williams v. Norfolk and Western Railway Co., 530 F.2d 539, 542 (1975).

IV.
"Any complaint filed pursuant to this article must be filed within ninety days after the alleged act of discrimination." Code, 5-11-10. This is a jurisdictional prerequisite. It measures one's ability to gain the act's protections, and is nonwaivable. Our commission cannot hear complaints filed more than ninety days after an alleged discriminatory act.[4]
But a seniority system superimposed on a "locked-in" status of discriminatory policies is a continuing violation of the Act. There is no evidence that these black employees are still classified "nonpromotable"; but they continuously suffer because their seniority system has never compensated them for initially putting them in inferior positions.[5]
At the same time Teamsters was decided, the Supreme Court, defining continuous violations, found that termination of employment was not an act that was a continuing violation. United Air Lines v. Evans, supra. The termination date started the filing time period.
Our definition of continuing violations[6] is similar to that in Montgomery Ward v. Fair Employment Practices Commission, 49 Ill.App.3d 796, 8 Ill.Dec. 297, 365 N.E.2d 535, 541-42 (1977), reh. denied, 365 N.E.2d 542.
*659 The court listed three factors to identify a continuing violation:
(1) Showing that the employee was an actual victim of the discriminatory act.
(2) This discrimination placed the employee in an inferior status due to subsequent application of an employment policy such as seniority, and
(3) That the effects of the past discrimination continued at least to a date within the limitation period before the filing of the charge.
So, there has been a continuing violation by the United Transportation Union: (1) each black plaintiff was hired and worked in a nonpromotable job classification; (2) later-hired white employees were promoted before plaintiffs, and have achieved higher seniority, giving them greater competitive-based privileges of employment; and (3) plaintiffs' seniority ratings, derived from a period when they were prohibited by their skin color from equal employment opportunities, existed at the time these charges were filed, and exist even today.
We find that (1) present effects of past, pre-Act discrimination that freeze employees into positions, are unlawful employment practices; (2) unions can be as responsible as employers for collective bargaining agreements that perpetuate past discriminatory effects; (3) our human rights act has no provision immunizing "bona fide competitive-status based" seniority systems from proscriptions against unlawful practices; (4) prior discriminatory policies or practices, the effects of which are maintained by a seniority system, are a continuous violation of the Act; and (5) courts should not interfere with Human Rights Commission's findings of fact if neither party challenges them or they are supported by substantial evidence.
No other issue was properly raised to this Court for adjudication. We reverse the trial court, and affirm the judgment and order of the West Virginia Human Rights Commission.
Reversed.
McHUGH, J., not participating.

APPENDIX
WEST VIRGINIA HUMAN RIGHTS COMMISSION'S FINDINGS OF FACT ON COMPLAINANT NOS. E-157-71, E-159-71, E-161-71, ET SEQ.
1. The Complainants herein are seventeen black employees of the Norfolk & Western Railway (N & W), namely: Wendell English, Calbe Lilly, Harold G. R. Hobson, P. H. Wilson, J. W. French, R. N. Witten, E. D. Campbell, M. Lilly, A. L. Palmer, G. O. Baumgardner, R. H. Scruggs, N. E. Baumgardner, G. A. Saunders, Jr., F. Trigg, Jr., H. T. Alexander, T. H. Mack, and W. B. Person. All Complainants work in the "yard" classification of the N & W at its Bluefield, West Virginia yard, and are commonly known as "yardmen." The first of the Complainants, Wendell English, was hired as a yardman by the N & W and established seniority on the yard brakeman roster in 1941; the last, W. B. Person, was hired as a yard brakeman in 1948. The seniority dates of all Complainants are shown on the Seniority Roster attached hereto as Attachment `A'. All Complainants are presently members of Respondent United Transportation Union, Local No. 655.
2. The Respondent United Transportation Union (UTU) is a national labor union and is the collective bargaining representative under the Railway Labor Act, 45 U.S.C. §§ 151 et seq., of the yardmen classification of the N & W and the classification of conductors and brakemen employed by N & W in the road service. The UTU is the successor to, and stands in the place of the Brotherhood of Railway Trainmen (BRT) which merged with other railroad unions to form the UTU in 1970. The BRT was the former collective bargaining representative of the classification of yardmen, road conductors and road brakemen employed by N & W, holding such status at the time all Complainants herein were hired.
3. Respondent United Transportation Union, Local No. 655, to which the Complainants *660 herein belong, is the successor to, and stands in place of BRT, Pocahontas Lodge No. 533, to which Complainants belonged prior to the union merger.
4. "Yard" employees and "road" employees are the two basic classifications of employees of the N & W Railroad at the Bluefield yard. The collective bargaining agreement between the N & W Railroad and Respondents UTU and UTU, Local No. 655, govern the employment terms and conditions of all yardmen in the Bluefield yard, and all road conductors and brakemen working out of the Bluefield yard (among others). Classifications for promotion levels within the yard classification include, in order of ascending seniority and qualification requirements: brakeman, conductor, and car retarder; within the road classification: brakeman, conductor, and fireman. (There are also engineers in this classification, but they are not included in UTU). The lowest levels of both the yard and the road classifications are entry-level classifications, that it, no previous experience is required by the company or the collective bargaining agreement for hire into those classifications. Pursuant to the collective bargaining agreements in effect since at least 1954 between the N & W and either BRT or UTU, promotions within the yard classification to the higher paying positions of yard conductor or car retarder depend upon seniority established on the yard brakeman seniority roster.
5. The present and past collective bargaining agreements between the N & W and BRT or UTU provide that an employee maintains seniority within either the yard classification or the road classification, but not both. In other words, a yard man has no seniority on the road, and a road man has no seniority in the yard. A move or a transfer by an employee from one classification to another (e. g. from the yard to the road) results in a loss of all seniority accumulated in the former classification.
6. The Union constitutions of BRT before 1960 contained provisions restricting membership in the BRT to "white males, sober and industrious." Prior to 1956, the collective bargaining agreements between the N & W and BRT designated blacks as "nonpromotable" yard men, that is, as the name implies, blacks could not be promoted out of the yard brakeman classification no matter how much seniority they had accumulated.
7. At the time all of the Complainants were hired, the N & W policy, acquised (sic) in and sanctioned by the Respondents, was that blacks were not to be hired on the road, i. e., in the road classification. When an emergency need for road men arose, senior black employees were bypassed and junior white employees were given the privilege of going on the road, usually a higher paying job. When black employees complained about this practice, all yard men, black or white, were bypassed for road service. Instead, section hands, operators and clerks, all-white classifications, were utilized for emergency road service to avoid putting blacks on the road. Several Complainants herein were told by N & W officials that blacks were not being hired on the road. Respondents herein made no attempt to correct or discontinue this form of discrimination.
8. Although employed as yard brakemen, a job classification regulated by the provisions of the collective bargaining agreements then in force between the N & W and the Respondents, the Complainants herein were systematically excluded from membership in the BRT, Pocahontas Lodge No. 533, by the provisions of section 110 of the 1950 BRT constitution and by the policies and actions of BRT, Pocahontas Lodge No. 533.
9. On December 22, 1955, at least three white yard brakemen, namely: E. H. Townley, F. W. Gott, and E. C. Perdue, were promoted to the position of yard conductor, the next highest classification within the yard, such higher classification carrying with it a commensurate higher rate of pay as set out in the collective bargaining agreement. All three white employees were junior in yard brakeman seniority to at least one of the Complainants herein. On February 27, 1956, at least ten more *661 white yard brakemen, namely: T. A. Taylor, Jr., J. E. Morris, J. D. Clark, W. H. Francis, F. F. Beaman, G. D. Hayes, J. Davis, L. E. Hoops, R. L. Townley, and R. D. Stevens, were also promoted to the position of yard conductor. All thirteen white yard brakemen promoted in 1955 and 1956, were in fact junior in seniority to at least one and usually more of the Complainants.
10. The white yard brakemen who were promoted were notified in advance by sealed envelopes that they were being considered for promotion to the position of yard conductor, whereas not one black yard brakeman ever received notice that he would be considered for such promotion. These promotions were made without notice being posted on a company bulletin board as was and is required by the collective bargaining agreement.
11. All the white yard brakemen in question knew at the time of their promotion that they were being promoted over at least one and usually more of the Complainants herein, even though said Complainant(s) had more seniority on the yard brakeman seniority roster. From this it is fair to conclude that officials of Pocahontas Lodge No. 533 were made aware of the contract violation embodied in these promotions, especially in light of the fact that Complainant Harold G. R. Hobson, three months after being permitted to join the union in July, 1956, proposed that the local union forward a grievance letter to the terminal yard master requesting him to reconsider the promotions made a year earlier in December, 1955, and February, 1956.
12. The Respondent local permitted its first blacks, including all seventeen of the Complainants herein, to join its membership on July 22, 1956. However, the Respondent local failed to supply the Complainants herein with copies of the union constitution and collective bargaining agreement, and failed to instruct or guide them regarding their rights as union members after the Complainants herein had been admitted into membership.
13. After being admitted into membership, the Complainants herein attempted to appeal to the union the aforesaid promotions of the thirteen white yard brakeman of 1954 and 1955, on the basis that said promotions were in contravention of the collective bargaining agreement in that the thirteen white yard brakemen were junior in seniority to at least one and usually more of the seventeen black yard brakemen, concerned herein. Harold G. R. Hobson, a Complainant herein, three months after being permitted to join the union, proposed that the local union forward a grievance letter to the terminal yard master requesting him to reconsider these discriminatory promotions. Even though the motion was carried, no action was taken. Hobson complained to the terminal yard master in 1956 about the promotions, and ultimately brought the grievance before the general grievance committee of the N & W system while he was president of the local. The other Complainants had communicated with Hobson with respect to their mutual grievance, and considered Mr. Hobson's grievance to be on behalf of all the Complainants herein.
14. BRT, and BRT Pocahontas Lodge No. 533, through inaction and passivism, gave its tacit support and active consent to the promotions in question.
15. On April 4, 1966, nine of the Complainants herein, namely: W. L. English, P. H. Wilson, H. G. Hobson, J. W. French, R. N. Witten, E. D. Campbell, C. Lilly, M. Lilly and A. L. Palmer, were promoted to the position of yard conductor and established seniority on that roster behind the thirteen white employees promoted in 1955 and 1956. On April 25, 1968, seven additional Complainants, namely: G. O. Baumgardner, R. H. Scruggs, N. E. Baumgardner, G. A. Saunders, Jr., F. Triggs, Jr., H. T. Alexander and T. H. Mack, were promoted to the position of yard conductor. On June 16, 1969, one other Complainant, W. B. Person, was promoted to the position of yard conductor. All seventeen Complainants established seniority in the yard conductor roster behind all thirteen of the white yard conductors previously promoted in 1955 and 1956.
*662 16. Those of the Complainants who are still working for the N & W are still locked into an inferior seniority position on the yard conductor seniority roster behind those white yard conductors promoted in 1955 and 1956 who are still working for the N & W, even though the Complainants herein are senior to at least one and usually more of these employees on the yard brakeman seniority roster.
17. Because the Complainants have less seniority than the white yard conductors who were promoted around them, they have been, and presently still are, subject to being "bumped" from jobs or outbid for jobs by these white yard conductors. This has resulted in the Complainants having to take lesser paying yard brakeman jobs or less desirable shifts as yard conductors.
18. The Complainants herein have suffered and continued to suffer, monetary loss because of the actions of the Respondents herein in refusing to put them in their proper place on the yard conductors seniority roster.
19. Having failed to gain remedy or corrective action of any kind from the Respondents herein to their grievance or complaint about the promotions of 1955 and 1956, Wendell English filed a complaint with the Equal Employment Opportunity Commission in September, 1970, relating to the matters subject herein. Three of the Complainants, Wendell English, Caleb Lilly and Harold Hobson, filed complaints with the West Virginia Human Rights Commission on April 3, 1971, on their behalf and on behalf of all seventeen affected black yardmen, charging the N & W and the Respondents herein with a continuing practice of racial discrimination.
20. After a staff investigation, the Commission issued a finding of Probable Cause to credit the allegations of the complaints. The complaints then proceeded to conciliation in an attempt to settle the case. As a part of a conciliation proposal approved by the N & W, a new seniority roster was drawn up for yard conductors whereby the Complainants would be put in their rightful place according to their yard brakeman seniority. However, as a result of a vote taken at a meeting of UTU Local No. 655 on September 29, 1972, the proposed settlement concerning the seniority rosters was rejected. This decision of Local No. 655 was acquiesed in and supported by the international union. As a result, the case proceeded to the present public hearing.
21. On March 13, 1975, prior to the beginning of this proceeding, Respondent N & W announced settlement on its part with Complainants and mutual assent to the signing of a conciliation agreement, a portion of which reads as follows:
`ITEM NO. 3
A. The company agrees that the names of the Complainants will be put on the seniority roster for conductors-Pocahontas division, Bluefield yard in positions as identified by red underlining on the attached "schedule A," at such time as such placements may be lawfully carried out and effectuated, it being understood, however, that company shall take no such action until proceeding involving claims of discrimination in said seniority roster by Complainants against the United Transportation Union as disclosed by the records of the aforesaid cases, as consolidated, pending before the Commission, wherein the United Transportation Union is named as Respondent, are finally adjudicated.'
This portion of the conciliation agreement was the same as that approved by N & W in September, 1972, and subsequently rejected by the Respondents herein on September 29, 1972. Thus, since September 29, 1972, the only obstacle to the Complainants herein being put in their proper place on the yard conductors seniority roster has been the opposition of Respondents herein....
NEELY, Justice, dissenting:
The majority opinion in this case causes me to reflect upon H. L. Mencken's comment that "judges are law students who grade their own examinations." It is always possible to make a metaphysical argument relating to statutes of limitations; the fact that a particular transaction can be *663 characterized in such a way as to avoid the application of a plain and unambiguous statute is hardly a triumph of either legal craftsmanship or judicial sagacity. In the case before us the plaintiffs have obviously been the object of untold cumulative injustice over their lifetimes by virtue of being Negroes who enjoyed their youth and prime of life in segregated America. Nonetheless, not only is the technical letter of the law entirely against the plaintiffs in this case, but the equity of the matter as well. The ramifications of today's decision in terms of completely upending issues in industrial government which were thought long settled is entirely awe inspiring, and its effect upon well established seniority systems which are the foundation of equitable union government is entirely disastrous.
In order to understand the catastrophic nature of the majority's opinion it is necessary to look carefully at the facts as they appear in the record. Before September 8, 1954, black employees were designated as non-promotable in the Collective Bargaining Agreement between the Brotherhood of Railroad Trainmen and the Norfolk and Western Railroad. In 1954 the agreement was amended to delete "race" as a qualification for promotion. According to article 41, Seniority and Promotion Regulation 2(1) of the 1954 Norfolk and Western rates of pay and regulations contract, "Yardmen will be considered in line of promotion in accordance with seniority, ability and fitness." By the very terms of the Collective Bargaining Agreement which resulted in the seniority and promotion regulations, there was a two-year statute of limitations within which yard men could appeal a rating or standing on the seniority roster by filing a written protest. The 1954 Constitution of The Brotherhood of Railroad Trainmen provided in rules 5 through 7 that employees could invoke a grievance procedure to protest employment practices of the Norfolk and Western.
In February 1956, white brakemen were given notice by the Norfolk and Western of their opportunity and eligibility for promotion to Conductor. These men were subsequently promoted over black brakemen and at least two white brakemen who possessed greater seniority than those promoted. In July 1956, blacks were admitted as members of Local No. 655 of the Brotherhood of Railroad Trainmen (BRT). Upon joining the Union all members were either provided with copies of the Constitution and Rate and Regulation Agreements, had copies made available to them, or received instruction on their contents from a fellow-union member. Neither the protest procedure provided for in the Rate and Regulation Agreement nor the grievance and appeal procedure provided for in the BRT's Constitution was ever used by the black or white employees passed over for promotion.
In 1964 the United States Congress passed the Civil Rights Act of 1964, the applicable part of which is Title VII, 42 U.S.C. § 2000(e), known as the Equal Employment Opportunities Act.
No brakemen, white or black, were promoted to conductors after February 1956 until sometime in 1966. Starting in 1966, and continuing through the time during which the hearings in this case were held, the N & W has posted notices of available promotions and made those promotions according to seniority established by the brakemen's seniority roster and in compliance with the seniority and promotion regulations. The seventeen black appellants were all promoted in order of seniority from 1966 to 1969.
In 1967 the West Virginia Human Rights Act, W.Va.Code, 5-11-1 [1967] et seq., was passed by the West Virginia Legislature and provided a 90 day filing period for complaints alleging employment discrimination. W.Va.Code, 5-11-10 [1967].
In 1969 the Brotherhood of Railroad Trainmen merged into the United Transportation Union by virtue of the Unification Agreement. By 1970, however, no complaints had been filed regarding the alleged discriminatory promotions which occurred in 1956 under either the Federal Civil Rights Act of 1870, the Federal Civil Rights Act of 1964, the grievance procedure provided in the BRT's 1954 and successor *664 constitutions, the protest procedure of the N & W rate and pay regulations, or in any court alleging a breach of the union's duty of fair representation. The union had a duty to hear such grievances under Steele v. Louisville & N. R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944).
On March 27, 1971, Caleb Lilly filed a complaint with the West Virginia Human Rights Commission alleging current injury from discrimination based upon acts which occurred in 1956. On March 30, 1971, Harold Hobson filed a complaint with the West Virginia Human Rights Commission on the same basis and was followed on April 3, 1971 by Wendell English. On February 24, 1975, two weeks before the hearing on the complaints filed by Mr. Lilly, Mr. Hobson, and Mr. English, the remaining fourteen appellants filed individual complaints with the West Virginia Human Rights Commission alleging substantially the same cause of action.
I initially characterized the majority's manipulation of the statute of limitations as metaphysical and there is little more that one can say on the subject other than to show its inherent absurdity by reference to traditional tort and contract statutes of limitation. If a person negligently causes an automobile accident with another person who as a result of the collision is forced to have an arm amputated, there is obviously a cause of action in tort. The statute of limitations governing that cause of action is two years, and the computation of the limitation period is measured from the date of the collision. It is obvious that a one-armed man suffers an injury which will continue through the rest of his life; however, no one has ever seriously argued that a man with one arm who has failed to sue for his damages within two years of the accident may bring an action against the tort-feasor fifteen years later because he is suffering a "continuing injury."
In the field of contracts, if a person enters into an oral contract with another for the delivery of five carloads of copper tubing and the other defaults and fails to deliver the tubing thereby causing a $100,000 loss of profits, there is a cause of action in contract measured by our five year statute of limitations. The time period under that statute begins on the day of default notwithstanding that the person who lost the profits can demonstrate that his balance sheet may be reduced by $100,000 into the indefinite future. Can any reasonable person seriously argue that twenty years after the default in the delivery of the copper the person who lost the profits may bring an action because he can conclusively prove that his balance sheet would include $100,000 more in business assets had he not suffered the loss from the default twenty years earlier?
The primary purposes of all statutes of limitations are the same: to insure that actions will be brought in a sufficiently timely manner to enable the defendant to marshal relevant evidence, and to permit people after a certain time to assume that stale claims will no longer be litigated so that they may arrange their future affairs with some certainty. Note, "Developments in the LawStatutes of Limitations" 63 Harv.L.Rev. 1177, 1185 (1950). Statutes of limitations for employee claims against an employer have the added purpose of contributing to employer-employee harmony. When claims are brought quickly, chances of amicable and immediate settlement are greater than when claims are allowed to be brought after several years. When liability is extended, the damages sought will often be so large that the employer will want to fight it in court, particularly when the action depends on metaphysical gymnastics in the first place. Note, "Continuing Violations of Title VII: A Suggested Approach," 63 Minn.L.Rev. 119, 144 (1978).
Obviously all of these goals are confounded when a court deliberately manipulates a clear and unambiguous statute of limitations. This Court should apply the statute of limitations as written. Engaging in metaphysical craftsmanship to circumvent the statute of limitations can only lead to needless confusion in future cases as circuit courts try to divine whether and when this Court will find a continuing violation. A *665 possible alternative is that, once having found a continuing violation, a court should then balance the needs of plaintiff against the prejudice to the defendant of having to defend a stale claim before permitting the case to continue. See, e. g., Kennan v. Pan American World Airways, Inc., 424 F.Supp. 721 (N.D.Cal.1976). I find such a balancing to be too subjective for efficient and meaningful application. Given the validity and importance of the purposes of the clear and unambiguous statute of limitations in this case, we achieve only mischief by contriving to get around it. In the long run, economic, social, and political justice will be best served by applying the statute as written.
The West Virginia Human Rights Act, W.Va.Code, 5-11-10 [1967] provides:
Any complaint filed pursuant to this article must be filed within ninety days after the alleged act of discrimination.
In the present case, no complaints were filed until at least fifteen years after the alleged unlawful promotions occurred and at least three years after the West Virginia Legislature provided a means of redress for the discrimination the appellant employees allegedly suffered. The majority has adopted the "continuing violation" theory which, as the majority has pointed out at length, has been accepted by other courts under other circumstances in order to add some flexibility to an otherwise rigid jurisdictional filing requirement. While there may, indeed, be substantial precedent in this regard, it is certainly not good precedent in the year 1981 with regard to a case of far-reaching implications and concerning an act of discrimination which is now almost twenty-five years old.
The continuing violation theory has been substantially limited by the United States Supreme Court in United Airlines v. Evans, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), which involved an airline employee who was required to resign when she married because company policy prohibited married flight attendants. Mrs. Evans resigned in 1968 and after the company policy discriminating against married employees was determined to be illegal she was reinstated in her job in 1972. One year later Mrs. Evans sued her employer for reinstatement of prior seniority rights. The Supreme Court found her claim to be barred because it had not been filed within the statutory time following her initial separation from employment. The Court said:
A discriminatory act which is not made the basis for a timely charge is ... merely an unfortunate event in history which has no present legal consequences.
Respondent emphasizes the fact that she has alleged a continuing violation. United's seniority system does indeed have a continuing impact on her pay and fringe benefits. But the emphasis should not be placed on mere continuity; the critical question is whether any present violation exists. 431 U.S. at 558, 97 S.Ct. at 1889 (emphasis in the original).
If the majority had limited its decision to the narrow facts of this case, the decision would not be as disastrous as it is. In the case before us it is at least possible to say that the individuals ahead of the appellants on the seniority roster were the same individuals who benefited from the initial act of discrimination. Furthermore, in the case before us at least the action was brought only four years after the passage of the West Virginia Human Rights Act. The way the majority opinion is written, however, it appears that an action could be brought in 1981 based upon an act of discrimination in 1956 which has had continuing repercusssions. Furthermore, in the countless thousands of cases which this opinion may precipitate, it is not possible to say that the persons who will be dislodged from their current position through the litigation of stale claims are in any regard culpable.
While I still disagree with the majority's decision, in order to reduce the potential havoc that this decision will create, I propose that the majority's decision should be interpreted narrowly in three respects. First, findings of continuing violations should be limited to cases in which the facts are virtually identical to the facts of this case. Second, even when a continuing violation *666 is found, the action should not proceed until after the Human Rights Commission or the circuit court has weighed the plaintiff's interests for a judgment against the defendant's difficulties in defending against stale claims. Third, the remedy of awarding retroactive seniority rights should not be given until after a hearing with notice to all third-party employees who will be disadvantageously affected by such a remedy.

I
If, despite my protestations, this Court is going to recognize continuing violations under the Human Rights Act, we should at least define continuing violations in a manner consistent with Evans. In Evans, the Supreme Court refused to find a continuing violation because the plaintiff had failed to show that the defendant differentiated between similarly situated employees within the statute of limitations time period. 431 U.S. at 558, 97 S.Ct. at 1889. The plaintiffs in the present case could conceivably meet the Supreme Court's test by arguing that they are currently ranked on the seniority list below white employees with similar or even less time with the company. Hence, we could rule that there is a continuing violation because the plaintiffs are being treated differently from the way in which similarly situated employees are being treated.
This test is more satisfactory than the three-point test the majority has borrowed from an appellate court in Illinois. Under the majority's test the plaintiff in Evans would win, as would any other discrimination victim who can show that he still feels the effects of an ancient act of discrimination. There is no doubt that policies and practices in our nation's only too recent segregated past have had a lifelong effect on all black people who lived in those years. In response to their plight, the Legislature passed the Human Rights Acts of 1967. However, the Act has not atoned for all the suffering and injustice of the past. Nor was it meant to. Just as my one-armed accident victim still feels pain fifteen years after the accident, so will victims of segregated schools and employment opportunities suffer from lowered earning potential in their later years. However, to attempt to provide seniority and lost wages for every victim of racial or sexual discrimination would be to engage in gross speculation about whether the victim in question would have stayed on the job, been promoted, or been fired. In the present case, such speculation is minimal. The plaintiffs have all actually earned the seniority which they are seeking. Therefore, in order to reduce the number of cases in which the relief sought is speculative, this case should be read narrowly. Continuing violations should be found only when there is current illegal discrimination between similarly situated individuals.

II
Even if there is an instance of an actual continuing violation similar to the one in this case, the case should not proceed until after either the Commission or a circuit court has conducted a threshold inquiry about whether the gravity of the plaintiff's claim outweighs the defendant's interests in being protected against stale claims. Certainly if this case had been brought today in 1981, the defendants could validly argue that they were being prejudiced by the stale nature of the claim. The defendants would inevitably have difficulty in retrieving all of their potentially exculpatory records. Additionally, I am loath to see today's decision cast a shadow of continuing liability on businesses and unions as they prepare and plan for the future. For instance, with the knowledge that they may be sued at any time for acts occurring years ago, companies may be hesitant to commit their capital to necessary employee benefit plans. The traditional purposes behind any statute of limitations should be considered before granting the plaintiffs a hearing on the merits. While I voiced skepticism about such a balancing test earlier in this dissent and while I would still prefer that the statute of limitations be applied strictly, I find this balancing test to be preferable to the *667 blatant disregard of the purposes behind a statute of limitations implicit in the majority's opinion.

III
Just as I think there should be a balancing of interests before a plaintiff's stale cause of action is permitted to proceed, I think there should be a balancing of interests before the plaintiffs are given the remedy of retroactive seniority. This Court or any court should be reluctant to tamper with the seniority system within a union. Seniority systems serve to strengthen unions by shielding them from acrimonious and divisive questions about merit promotions. More importantly, the strength of the seniority system adds to the sense of security felt by the employees. When courts start handing out retroactive seniority on the basis of acts that took place ten or twenty years before, the courts will severely disrupt both the sense of security felt by other employees and the strength of the union itself.
If a person works for a unionized West Virginia company governed by a seniority scheme in 1971, he is, under the continuing violation theory, susceptible to being dislodged from his current position as a result of union and/or company activities which may have occurred in the late 1950s. Furthermore, the hypothetical employee who entered the labor market in 1971 is wholly innocent: he was utterly unaware of past discriminatory practices; he did not participate in any current discriminatory practices; and he has foregone other options in terms of a career plan in reliance upon the fact that discriminatory practices prior to ninety days after the passage of the West Virginia Human Rights Act are no longer actionable.
Under the American scheme of labor relations law, labor unions are charged with enormous responsibility in the management of industrial affairs and the securing of industrial justice. It is true that the Brotherhood of Railroad Trainmen, operating under contemporary standards of morality in the 1950s, discriminated against the plaintiffs in this case in a most unjust way. Nonetheless, the position of a labor union within the industrial structure is not easy: the union is responsible for securing full employment; the union is responsible for securing high wages and benefits; the union is responsible for guaranteeing fair treatment to its members by the employer; and, the union is responsible for mitigating militant and irresponsible conduct on the part of employees which tends to cause disruption of the industrial process and a reduction in the overall community economic well-being.
These goals are hardly entirely consistent with one another, and it requires the skillful application of political principles by the leadership of organized labor to reconcile the conflicting goals of a most divergent membership. The preeminent vehicle for establishing peace and certainty within the entire difficult area of hiring, promotion, and retention is the use of a union seniority system. It is for that reason that the United States Congress specifically included section 703(h) in Title VII of the Civil Rights Act of 1964. This section codifies Congress' intent that Title VII should not affect seniority rights even where the employer had discriminated before the Act's passage. Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) makes it clear that existing seniority systems are not to be entirely confounded as a result of past discrimination. The Supreme Court said:
Although a seniority system inevitably tends to perpetuate the effects of pre-Act discrimination ... the congressional judgment was that Title VII should not outlaw the use of existing seniority lists and thereby destroy or water down the vested seniority rights of employees simply because their employer had engaged in discrimination prior to the passage of the Act.
... But our reading of the legislative history compels us to reject the Government's broad argument that no seniority system that tends to perpetuate pre-Act discrimination can be `bona fide'. To accept the argument would require us to *668 hold that a seniority system becomes illegal simply because it allows the full exercise of the pre-Act seniority rights of employees of a company that discriminated before Title VII was enacted. It would place an affirmative obligation on the parties to the seniority agreement to subordinate those rights in favor of the claims of pre-Act discriminatees without seniority. The consequence would be a perversion of the congressional purpose.... Accordingly, we hold that an otherwise neutral legitimate seniority system does not become unlawful under Title VII simply because it may perpetuate pre-Act discrimination. Congress did not intend to make it illegal for employees with vested seniority rights to continue to exercise those rights, even at the expense of pre-Act discriminatees.
Id. at 352-54, 97 S.Ct. at 1863-64.
The majority discusses at great length the fact that our West Virginia Human Rights Act does not include an equivalent of section 703(h) of the Federal Civil Rights Act of 1964 which immunizes "bona fide" seniority systems from challenges for past discrimination. The majority infers that our Legislature's deliberate silence on bona fide seniority systems demonstrates that they are not exempt. I do not challenge that conclusion since it is based upon a plain reading of the statute. However, if one wishes to resort to plain readings of statutes, it is entirely obligatory to read plainly the entire statute. While our Human Rights Act does not have a specific exemption for bona fide seniority systems, it does have a specific statute of limitations which requires claims to be filed within ninety days.
Most of the labor litigation in America proceeds in the courts of the United States, and accordingly the primary expertise in the judicial system concerning labor matters resides in those courts. It is obvious from the firm holding of Teamsters, supra, that the Supreme Court of the United States enjoys the same high regard for labor peace and good union management that I do when they go as far as they can to protect the integrity of seniority systems. While the West Virginia Human Rights Act may be more expansive in the type of discriminatory activity which it proscribes than the Federal Civil Rights Act, nonetheless, it certainly contemplates that there will be a rapid litigation of discrimination matters so that entirely innocent persons do not go on for decade after decade predicating their life's expectations upon a system which the continuing tort theory turns into a house of cards.
In the present case the giving of retroactive seniority to the plaintiffs will adversely affect only those white employees who received an unfair advantage in the 1950's. However, the majority opinion does not limit that remedy to cases like the one before us. Under the words of the majority opinion such a remedy could be awarded in cases where other affected employees are wholly innocent, and where those innocent employees will lose their competitive seniority status upon which they may have relied in making personal and professional decisions. Before the Commission awards retroactive seniority, the Commission should hold a hearing at which it balances the interests of the plaintiffs in securing industrial justice against the interests of innocent non-party employees. E. g., Meadows v. Ford Motor Co., 510 F.2d 939 (6th Cir. 1975) cert. denied, 425 U.S. 998, 96 S.Ct. 2215, 48 L.Ed.2d 823 (1976).
While the majority decision has given absolute protection to the interests of the plaintiffs, it has been totally blind to the real nature of continuing violations, to the purposes of a statute of limitations, to interests of innocent third-party employees. This is unnecessary and unjust. Our job here is not to bestow blanket rights on an interest group, no matter how sympathetic its cause; rather, our duty is to insure that all interested parties are provided a fair hearing. Our entire system of justice through adversarial representation is based on the theory that every person has a right not only to a fair hearing, but also to an individualized, principled, and equitable result. It has been our society's observation *669 that when the rights of all the parties are fully developed at a trial, the resolution of the trial will be the most just. To the extent that the majority's opinion diverges from that ideal, I most profoundly and sincerely dissent.
NOTES
[1] E.E.O.C. v. Detroit Edison Co., 515 F.2d 301, 314 (6th Cir. 1975), vacated on other grounds, 431 U.S. 951, 97 S.Ct. 2668, 53 L.Ed.2d 267 (1977); Rodriquez v. East Texas Motor Freight, 505 F.2d 40 (5th Cir. 1974), vacated on other grounds, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977); Macklin v. Spector Freight Systems, Inc., 478 F.2d 979 (D.C.Cir.1973); Chrapliwy v. Uniroyal, Inc., 458 F.Supp. 252 (N.D.Ind.1977); United States v. City of Buffalo, 457 F.Supp. 612 (W.D.N.Y.1978); Dickerson v. U. S. Steel Corp., 439 F.Supp. 55 (E.D.Pa.1977), reversed on other grounds, 582 F.2d 827 (1978); Ivey v. Western Elec. Co., 16 Empl.Prac.Dec. 5548 (N.D.Ga.1977); E.E.O.C. v. Enterprise Ass'n. Steamfitters, 542 F.2d 579 (2d Cir. 1976); Peters v. Missouri-Pacific R. R. Co., 483 F.2d 490 (5th Cir. 1973); Note, Union Liability For Employer Discrimination, 93 Harv.L.Rev. 702 (1980); Youngdahl, Suggestions for Labor Unions Faced With Liability Under Title VII of the Civil Rights Acts of 1964, 27 Ark.L.Rev. 631 (1973).
[2] Other states have adopted the Griggs test of looking to consequences rather than intent for what constitutes an unlawful employment practice: N. Inyo Hospital v. Fair Employment Practice Commission, 38 Cal.App.3d 14, 112 Cal.Rptr. 872 (1974); Evening Sentinel v. National Organization for Women, 168 Conn. 26, 357 A.2d 498 (1975); City of Cairo v. Fair Employment Practices Commission, 21 Ill.App.3d 358, 315 N.E.2d 344 (1974); Indiana Civil Rights Commission v. Sunderland Lumber, Ind.App., 394 N.E.2d 949 (1979); Wilson-Sinclair Co. v. Griggs, Iowa, 211 N.W.2d 133 (1973); Middlesboro Housing Authority v. Kentucky Commission on Human Rights, Ky., 553 S.W.2d 57 (1977); Maine Human Rights Commission v. Local 1361, United Paperworkers International Union, AFL-CIO, Me., 383 A.2d 369 (1978); School Committee of Braintree v. Massachusetts Commission Against Discrimination, 377 Mass. 424, 386 N.E.2d 1251 (1979); Brotherhood of Railway and S. S. Clerks, Freight Handlers, Express and Station Employees, Lodge 364 v. State, 303 Minn. 178, 229 N.W.2d 3 (1975); Physicians Mutual Ins. Co. v. Duffy, 191 Neb. 233, 214 N.W.2d 471 (1974); State Division of Human Rights v. Kilian Mfg. Corp., 35 N.Y.2d 201, 360 N.Y.S.2d 603, 318 N.E.2d 770 (1974), appeal dismissed, 420 U.S. 915, 95 S.Ct. 1108, 43 L.Ed.2d 387; General Electric Corp. v. Human Relations Commission, 469 Pa. 292, 365 A.2d 649 (1976); Fahn v. Cowlitz County, 93 Wash.2d 368, 610 P.2d 857 (1980); Wis. Tel. Co. v. Department of Industry, Labor and Human Relations, 68 Wis.2d 345, 228 N.W.2d 649 (1975).

Before Teamsters, see text infra, federal courts consistently held seniority systems violated Title VII if they perpetuated past discrimination by freezing blacks in inequitable positions. See Teamsters, supra 431 U.S., at 378 n.2, 97 S.Ct. at 1876 n.2 (Marshall, J., dissenting); Silbergeld, Title VII and the Collective Bargaining Agreement: Seniority Provisions Under Fire, 49 Temp.L.Q. 288 (1976); Note, Title VII, Seniority Discrimination, and the Incumbent Negro, 80 Harv.L.Rev. 1260 (1967); 34 A.L.R.Fed. 18 (1969 and Supp.).
[3] 42 U.S.C. § 2000e-2(h):

"Seniority or merit system; ability tests. Notwithstanding any other provision of this title [42 USCS §§ 2000e et seq.], it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, ..."
[4] Tolling is not involved. There is a circuit split on whether the jurisdictional filing period is absolute under Title VII, and the Supreme Court recently granted certiorari in In Re Consolidated Pretrial Proceedings v. Trans World Airlines, 582 F.2d 1142 (7th Cir. 1978), cert. granted, Zipes v. Trans World Airlines, ___ U.S. ___, 101 S.Ct. 1511, 67 L.Ed.2d 813 (1981). See Annotation, Time Requirements for Civil Action for Violation of Equal Employment Opportunities Provisions Under § 706 of Civil Rights Act of 1964 (42 U.S.C. 2000e-5), 4 A.L.R.Fed. 833 (1970 and Supp.).
[5] Justice Neely states in his dissent, that we have here something analogous to a tort with a continuing injury. Statutes of limitations prevent victims of tortious acts, knowledgeable about their injuries, from prosecuting stale claims regardless of whether their pain persists five, seven or ten years after the commission of the tort. The tort victim's injury is no less real in ten years, but public policy precludes presentation of his or her cause to the courts.

His argument would be interesting if we had one tortious act that resulted in one injury that simply kept on hurting. That is not this case. Everytime this seniority system is applied to plaintiffs' status as defined by their former inclusion in a racially discriminatory job classification, there is a new injury. We do not have persisting pain from one tortious act; we have continuous injurious conduct, up to this very moment.
A correct analogy is this: If these people had been falsely imprisoned all these years, they could have brought suit at anytime within the applicable period of limitations starting from the date of their initial imprisonment; but each moment of wrongful restraint thereafter would generate a new basis for suit and would commence anew a running of time limitations on filing. See 32 Am.Jur.2d False Imprisonment, § 84.
[6] Additional authority is United Air Lines, Inc. v. Evans, supra 431 U.S., at 561, 97 S.Ct. at 1890 (Marshall, J., dissenting). See also E.E.O.C. Interpretative Memorandum, [1977] 2 Empl.Prac.Guide (C.C.H.) ¶ 5029; Jackson and Matheson, The Continuing Violation Theory and the Concept of Jurisdiction in Title VII Suits, 67 Geo.L.J. 811 (1979); Note, Continuing Violations in Private Suits Under Title VIIof the Civil Rights Act of 1964, 32 Ark.L.Rev. 381 (1978).