436 S.E.2d 293

Lacy CHILDRESS, Complainant
Below, Appellee,

v.

The WEST VIRGINIA HUMAN RIGHTS
COMMISSION and The Mingo County
Commission, Respondents Below.

The West Virginia Human Rights
Commission, Appellee,

The Mingo County Commission,
Appellant.

No. 21551.

Supreme Court of Appeals of
West Virginia.

Submitted May 5, 1993.

Decided June 10, 1993.

William H. Duty, Asst. Pros. Atty., Williamson, for appellant, Mingo County Com'n.

Paul R. Sheridan, Sr. Asst. Atty. Gen., Charleston, for appellee, WV Human Rights Com'n.

Lacy Childress, pro se.

PER CURIAM:

This is an appeal by the Mingo County Commission from an order of the West Virginia Human Rights Commission holding that the Mingo County Commission had engaged in unlawful race discrimination against a former cook at the Mingo County Jail, Lacy Childress. The Human Rights Commission ordered the Mingo County Commission to hire Ms. Childress as soon as an appropriate opening appeared at the Mingo County Jail and directed that the County Commission pay her damages for the past discrimination. In the present proceeding, the Mingo County Commission claims that there was no evidence of discrimination and that, under the circumstances, the Human Rights Commission's findings and conclusions were erroneous. After reviewing the record and the questions presented, this Court disagrees. The judgment of the West Virginia Human Rights Commission is, therefore, affirmed.

In late 1987, the Mingo County Commission hired Lacy Childress, a black woman, to work as a temporary cook at the Mingo County Jail. She was hired because one of

the two permanent cooks at the jail had been suspended for serving spoiled hot dogs and for giving an inmate food poisoning. When she was hired, Ms. Childress, according to her testimony, was told by a Mingo County administrator, Linda Smallwood, "If you do a good job maybe this might lead to something permanent." At the time, Ms. Childress suggested that she might be interested in something permanent, and Ms. Smallwood told her that she would discuss the matter with her when the temporary job ended.

In March or April, 1988, due to the fact that the permanent employee had returned to work, Ms. Childress was relieved of her temporary job. At the time, Ms. Childress was told that there might be a permanent opening for a cook in August and that if she was interested, she should return in August.

An opening developed at the jail in June, 1988. Ms. Childress learned of that opening and applied for the position. She, however, was not hired, and a white woman was hired instead. When other openings later developed, white women were again hired.

Ms. Childress subsequently filed a complaint with the West Virginia Human Rights Commission. In the complaint, Ms. Childress alleged:

I believe I was discriminated against on the basis of my Race, Black, in that:

a. I was hired by the Respondent for approximately one year. I was laid off due to the reinstatement of a former employee. I was told that I would be rehired when a vacancy became available. I continued to substitute as Cook.

b. The Respondent hired a White employee with no previous experience.

c. According to all reports, my job performance was satisfactory.

The Mingo County Commission filed an answer in which it denied that Ms. Childress was "denied an equal opportunity in employment with the Respondent at any time" and further denied that Ms. Childress was "discriminated against because of ... race."

Following the filing of the complaint and answer, hearings were conducted before a hearing examiner.

In the course of the hearings, the County Commission introduced the deposition of Linda Smallwood, the administrator who administered its personnel matters. In that deposition, Ms. Smallwood testified that Ms. Childress was hired as a temporary cook for the Mingo County Jail in December, 1987. She acknowledged that she had told Ms. Childress that she would be hired for a permanent position if she "worked out," and she vaguely remembered Ms. Childress applying for the position of permanent cook. In spite of this, Deanna Collins, a white person who had also previously been hired as a temporary cook, was appointed to the permanent cook's position in 1988.

Ms. Smallwood indicated that Ms. Collins, rather than Ms. Childress, had been appointed to the permanent position because complaints had been made about Ms. Childress' food and about the kitchen being dirty while she served as a temporary cook. She also suggested that Ms. Childress had slept on her job and that she had been involved in something which was subsequently called "the wine bottle incident." Ms. Smallwood further testified that the color of Ms. Childress' skin did not affect the hiring procedure.

On cross-examination, Ms. Smallwood explained that Ms. Childress was initially hired after a permanent cook, a Mr. Tiller, was suspended. In explaining the suspension, Ms. Smallwood explained:

A. He wouldn't cook the food thoroughly. He wouldn't clean the kitchen. He was allowing the trustees to do the work. He was sleeping on the cot. He would go into the kitchen without a shirt. He wouldn't want to wear his little cap or hair net. I can go on and on and on with Mr. Tiller.

Q. Is it true that he once served tainted hot dogs or hamburgers.

A. Yes, sir. There was a big article in the Williamson Daily News.

Q. He was suspended for that?

A. Yes, sir.

At the end of the suspension, Mr. Tiller was allowed to return to his permanent position and to work until he retired in 1988.

Ms. Smallwood testified that four or five complaints had been made about Ms. Childress' food. In spite of this, Ms. Smallwood contacted Ms. Childress on only two occasions about the complaints. Although she could not remember the exact character of the complaints, she characterized them as being "too much spices in it" and "too much garlic."

Relating to the cleanliness problem in the kitchen, Ms. Smallwood testified that when she went to the kitchen while Ms. Childress was in charge she could see grease on the trays and that they were not clean. The stove and the oven were not clean, and the windows were also dirty. She also indicated that there was grease on the floor. Upon being pressed regarding the situation, Ms. Smallwood acknowledged that there had also been similar cleanliness problems with Mr. Tiller and, although she had kept personnel records, she had made no notations in them about Ms. Childress' deficiencies.

Upon being cross-examined about Ms. Childress sleeping on the job, Ms. Smallwood testified as follows:

Q. Now, regarding sleeping on the job, you said you had a problem with Miss Childers [sic] and also a problem with Mr. Tiller.

A. Yes, sir.

Q. Why was there a cot there?

A. A cot?

Q. Yes. You said Mr. Tiller was on the cot and Miss Childers [sic] was sleeping on the cot.

A. Well, this is before we remodeled the kitchen area. You could go in—there was a cell right next to the kitchen, and they would go in there on that cot; I guess that's what you call a jail bed. They'd be in the cell on the bed and they'd have music, you know, the radio was on pretty loud.

Q. Did you at any time tell her that it was okay during her 13–hour shift to take a ten-minute break or a fifteen-minute break?

A. Well, I told her that she was to take her breaks, and that when she got her lunch hour, she didn't have to stay in the kitchen, you know, she could leave the courthouse and do what she needed to do.

Q. Could she go in and take a nap on the cot if she was on break?

A. Sure. If that's what she wanted to do.

Q. How many times did you catch her sleeping?

A. I went up there three times, and all three times she was asleep or she was on the cot.

Q. Asleep or awake?

A. She was lying down. I don't recall if she was asleep all three times or not, but she was on the cot.

The so-called "wine bottle incident" involved the discovery of a bottle of wine in the jail refrigerator. Ms. Smallwood initially testified that only Ms. Childress should have had access to the jail kitchen at the time of the incident. On cross-examination, she indicated that there were a number of people, "the officers, correctional officers and police officers, per se, eating there and just sort of going in and taking food." She indicated that it was a "very free" situation. When questioned why she attributed the situation to Ms. Childress, Ms. Smallwood testified:

A. Because she was in charge of the kitchen. You're losing sight. She is the person responsible for the kitchen and what's in that kitchen and what's done in that kitchen. If she felt someone else put that there and it was there, she should have come and told me. Therefore, it was looked at as though she did it.

Q. So, you're not saying that she was the one who placed that bottle of wine in the refrigerator, but it was her responsibility?

A. Right.

Q. So, you're not accusing her of going to the liquor store and buying wine and putting it in the refrigerator?

A. No, I'm not accusing her of drinking on the job or anything like that. I never had that report.

Ms. Childress also adduced substantial evidence during the hearings. That evidence showed that she was a black person, that she had substantial prior experience as a cook, that she had worked for the Mingo County Commission as a temporary cook, and that she had applied for a permanent position. It also showed that, although she had never received a write-up or formal complaint about her performance as a temporary cook, she was not hired for the permanent position with the County Commission and that a number of white cooks were hired after she applied.

Ms. Childress admitted that she had received informal complaints from a vegetarian about mixing meat with vegetables, but she testified that she attempted to correct the situation. She also admitted that there had been complaints about their pancakes, but she showed that complaints about the food at the jail were common. For example, Deanna Collins, the white person who ultimately filled the permanent position, testified:

A. The guys, you know you can't please them. They complain about the food and things like that, nothing major.

Q. So, you got complaints?

A. Everybody gets complaints up there. No matter what you give them, they're never satisfied. You'd think that was the Ritz up there.

Relating to the cleanliness of the kitchen, Ms. Childress testified that the Health Department examined it and:

They had got a 74 before I came. I don't know what the score was, but it was real high when they came the next time. I don't know what the score was, but I know that we cleaned the kitchen up, got all the corrections made.

The sheriff took care of the things that I couldn't take care of, you know, like the painting that had to be taken care of, the floors had to be ripped up and then scrubbed.

Ms. Childress categorically denied that she had slept on the job, and while she admitted resting, she suggested that that was allowed, given the long hours that she worked.

Lastly, Ms. Childress denied that she had anything to do with the wine bottle. She indicated that a number of people had access to the refrigerator at the time it was discovered. Only after the incident was access to the refrigerator restricted.

The hearing examiner weighed the evidence adduced in the case and concluded that the complaints regarding Ms. Childress' performance were insufficient to justify denying her a permanent position. The examiner also concluded that the Mingo County Commission had discriminated against her on the basis of race and concluded that she was entitled to damages and relief.

The West Virginia Human Rights Commission upheld the hearing examiner's findings, but modified the hearing examiner's damage award of $28,170.00 to include $2,950.00 in incidental damages. The Mingo County Commission was also ordered to place Ms. Childress in the next available jail cook position.

It is from the ruling of the West Virginia Human Rights Commission that the Mingo County Commission now appeals.

■ In syllabus point 1 of *Frank's Shoe Store v. Human Rights Commission*, 179 W.Va. 53, 365 S.E.2d 251 (1986), this Court stated:

"West Virginia Human Rights Commission's findings of fact should be sustained by reviewing courts if they are supported by substantial evidence or are unchallenged by the parties." Syl. pt. 1, *West Virginia Human Rights Commission v. United Transportation Union, Local No. 655*, 167 W.Va. 282, 280 S.E.2d 653 (1981).

■ In *Shepherdstown Volunteer Fire Department v. State of West Virginia Human Rights Commission*, 172 W.Va. 627, 309

S.E.2d 342 (1983), this Court examined the showing that is necessary to establish an unlawful discriminatory practice in employment under West Virginia's Human Rights Act. In syllabus point 3 of that case, the Court outlined the steps which should be followed by the Human Rights Commission in determining whether discrimination has occurred. That syllabus point states:

In an action to redress unlawful discriminatory practices in employment and access to "place[s] of public accommodations" under The West Virginia Human Rights Act, *as amended, W.Va. Code,* 5–11–1 *et seq.,* the burden is upon the complainant to prove by a preponderance of the evidence a prima facie case of discrimination, which burden may be carried by showing (1) that the complainant belongs to a protected group under the statute; (2) that he or she applied and was qualified for the position or opening; (3) that he or she was rejected despite his or her qualifications; and (4) that after the rejection the respondent continued to accept the applications of similarly qualified persons. If the complainant is successful in creating this rebuttable presumption of discrimination, the burden then shifts to the respondent to offer some legitimate and nondiscriminatory reason for the rejection. Should the respondent succeed in rebutting the presumption of discrimination, then the complainant has the opportunity to prove by a preponderance of the evidence that the reasons offered by the respondent were merely a pretext for the unlawful discrimination.

█ In the case presently before the Court, Ms. Childress introduced evidence showing that she was a black person, a member of protected group under The West Virginia Human Rights Act, *W.Va.Code,* 5–11–1 *et seq.* The evidence also showed that prior to applying for the position with the Mingo County Commission, Ms. Childress had worked as a cook and as a manager at a Long John Silver's restaurant for approximately two years and that she had worked at a pizza store, preparing various types of food,

for approximately two and one-half years. She had also worked at a place called "The Little Venice" as a sandwich preparer and cook and had worked in other food establishments. When she was initially hired, the Mingo County Commission considered her sufficiently qualified to place her in a cook's position. It even appears that after she had worked for the initial period for which she was temporarily hired, she was asked to remain on the job somewhat longer while the permanent cooks went on vacation.

In this Court's view, the evidence adduced during the hearing supports the conclusion that Ms. Childress was qualified for the position of jail cook.

As indicated in syllabus point 3 of *Shepherdstown Volunteer Fire Department v. State of West Virginia Human Rights Commission, Id.,* to establish a *prima facie* case of discrimination, a complainant must show not only that he or she was a member of a protected group and that he or she applied for and was qualified for a position or opening, but that he or she was rejected despite his or her qualifications and that after the rejection the employer continued to accept the applications of similarly qualified persons.

█ In the present case, Ms. Childress did show that she was rejected after she left the Mingo County Commission cook position, despite the fact that she expressed an interest in a permanent position when one became available, and despite the fact, as previously indicated, that she had established qualification for the position. Following her rejection, the Mingo County Commission on a number of occasions hired people other than Ms. Childress for jail cook positions as they became open. All those individuals were white.

In reviewing the evidence, this Court concludes that it was sufficient to establish a *prima facie* case of discrimination under The West Virginia Human Rights Act.

As indicated further in syllabus point 3 of *Shepherdstown Volunteer Fire Department, Id.,* even though a *prima facie* case is suc-

cessfully established, the employer may rebut that case by offering some legitimate and nondiscriminatory reason for rejection. In the present case, the Mingo County Commission attempted to rebut Ms. Childress' *prima facie* case by showing that there had been complaints regarding her cooking, that she had failed to clean the kitchen, that she had been caught sleeping on a cot during work, and that she was suspected of being involved in the so-called "wine bottle incident."

In weighing the evidence, the hearing examiner, and the West Virginia Human Rights Commission by affirming the examiner's findings, concluded that the reasons offered by the Mingo County Commission as legitimate and nondiscriminatory reasons for refusing to hire Ms. Childress were mere pretext.

 As indicated in *West Virginia Human Rights Commission v. United Transportation Union Local No. 655, supra*, findings of fact of the West Virginia Human Rights Commission should be sustained by the reviewing court if they are supported by substantial evidence. As previously indicated the evidence in the present case establishes a *prima facie* case of discrimination. Further, a fair implication from the evidence adduced is that the complaints about Ms. Childress' food were not adequate justification for denying her permanent employment. More serious complaints, involving food poisoning on the part of Mr. Tiller were not considered sufficiently significant to deny him permanent employment, and complaints were lodged against the white cook, Deanna Collins, who was placed in the permanent position. Also, it may be fairly concluded from the conflicting evidence adduced that while at one point the kitchen may have been dirty, the situation was not wholly attributable to Ms. Childress and that she took steps to correct it. Further, while Ms. Childress did rest on the job, she was permitted to do so by the County Commission. Lastly, the evidence does not necessarily connect Ms. Childress to "the wine bottle incident." In this Court's view, the evidence adduced substantially supports the Human Rights Commission's conclusion that there was a *prima*

*facie* case of race discrimination and that the reasons offered for it by the Mingo County Commission were mere pretext.

The decision of the West Virginia Human Rights Commission is, therefore, affirmed.

Affirmed.

NEELY, J., dissents and would reverse the decision of the West Virginia Human Rights Commission.